# EXHIBIT A

1

1 UNITED STATES DISTRICT COURT

2 WESTERN DISTRICT OF NEW YORK

3 -------------------------------------------------

4 **MARK T. DUBLINO,**

5 Plaintiff,

6 -vs-                        **Case No: 19-CV-6269**

7 SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,
  DEPUTY BRIAN THOMPSON, DEPUTY FRANK GELSTER,

8 SGT. MR. CROSS, SGT. MR. ROBINSON,
  DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON.

9

10 Defendants.
   -------------------------------------------------

11

12 Virtual Examination Before Trial of

13 **MARK T. DUBLINO,** held pursuant to Article 31 of the

14 Civil Practice Law and Rules, commencing on Monday,

15 June 7th, 2021 at 10:00 A.M., before Denise C.

16 Burger, Notary Public.

17

18

19

20

21

22

23

**MCCANN & MCCANN REPORTING**

2

```
 1   APPEARANCES:  MODICA LAW FIRM:
                   BY: STEVEN V. MODICA, ESQ.,
 2                 2430 Ridgeway Avenue,
                   Suite 1,
 3                 Rochester, New York 14626,
                   (585) 368-1111
 4                 e-mail: Steve@ModicaLawFirm.com,
                   Attorneys for Mark Dublino.
 5
                   MICHAEL A. SIRAGUSA, ESQ,
 6                 ERIE COUNTY ATTORNEY
                   BY: ERIN E. MOLISANI, ESQ.,
 7                 ASSISTANT COUNTY ATTORNEY,
                   95 Franklin Street,
 8                 Room 1634,
                   Buffalo, New York 14202,
 9                 (716) 858-2216,
                   e-mail: Erin.Molisani@erie.gov,
10                 Attorneys for the Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23
```

MCCANN & MCCANN REPORTING

3

1                    E X H I B I T S

2  **EXHIBIT NO:**                                    **PAGE**

3  1. Disciplinary Report.                              4

4  2. Medical records.                                  4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**MCCANN & MCCANN REPORTING**

4

1    (The following were marked for identification)

2              Exhibits 1 & 2.

3

4  The following stipulations were entered into by

5  counsel:

6

7    It is hereby stipulated by and between the

8  attorneys for the respective parties hereto that

9  the oath of the Referee is waived, that signing,

10 filing and certification of the transcript are

11 waived and that all objections, except as to the

12 form of the questions, are to be reserved until the

13 time of trial.

14

15           **M A R K   D U B L I N O,**

16    having been first duly sworn, was examined

17 and testified as follows:

18

19    THE REPORTER:  Can you state your name for

20 the record, please.

21    THE WITNESS:  Mark Dublino.

22

23

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

5

1   **EXAMINATION BY MS. MOLISANI:**

2       **Q.**   Good morning, Mr. Dublino, how are you?

3       **A.**   Good morning.

4       **Q.**   We have met before, but for the record,

5   my name is Erin Molisani and I represent the

6   deputies and sergeants that you started a claim

7   against.

8        So as you know, we're here today to discuss

9   an incident that occurred on March 9th, 2018 and

10  ask you some questions.  So I think -- just let me

11  know when you're ready.

12      **A.**   Yes, go ahead.

13      **Q.**   Okay, just the noises, it makes it sort

14  of difficult, so -- is there anyone else in the

15  room with you presently?

16

17            (Technical difficulties.)

18          (Whereupon, a short recess was taken.)

19

20  **BY MS. MOLISANI:**

21      **Q.**   Mr. Dublino, can you just repeat the

22  answer that you said that the court reporter wasn't

23  able to catch, about whether --

**MCCANN & MCCANN REPORTING**

1        **A.**   I am sorry, you want me to repeat the
2    question?

3        **Q.**   I will just repeat the question.  Is
4    there anyone in the room with you presently?

5        **A.**   Yes, my counselor, Ms. Cabrerra.
6    Officer Ers.  And Officer Ers.  Ms. Ers and Ms.
7    Cabrerra.

8        **Q.**   Okay, thank you.  And you have a number
9    of documents in front of you presently, are those
10    pleadings related to this lawsuit?

11        **A.**   I am sorry?

12        **Q.**   You have a number of documents and
13    materials in front of you, are those pleadings
14    related to this lawsuit?

15        **A.**   Pleadings?

16        **Q.**   Yes.

17        **A.**   No, they're not pleadings.

18        **Q.**   Okay.  What is in front of you?

19        **A.**   I -- just names.  Names of the
20    officers.

21        **Q.**   Okay, it looks like --

22        **A.**   The officers.

23        **Q.**   Okay, the officers involved in this

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

7

1  incident?

2      **A.**    Yeah, I have the names of the officers

3  in case I need that, you know, to remember a name,

4  you know, because it's been so long, but I have a

5  pretty good grasp of everything.  Go ahead.

6      **Q.**    All right, it looks to me you have two

7  to three separate stacks of papers, so can you

8  elaborate on what you're looking at?

9      **A.**    Well, one is a sick call request.  One

10  are felony complaints.  One is the letter to Modica

11  Law Firm.  One is the letter from the Modica's Law

12  Firm confirming the depositions that are scheduled

13  for the rest of the week that I am going to be

14  excluded on.  I don't know why I would be excluded,

15  but I am being excluded.  And something about

16  justification.

17      **Q.**    Okay.  Would you just do me a favor and

18  if you need to look at the documents in front of

19  you, would you let me know that you intend to do

20  that?

21      **A.**    Okay, very good.

22      **Q.**    Thank you.  And you're presently

23  incarcerated; is that correct?

1       **A.**    Yes, I am.

2       **Q.**    And you're at Wende?

3       **A.**    I am at Wende Correctional Facility.

4       **Q.**    Okay.  I know you have been through a

5 couple of depositions.  We have been through a

6 couple depositions together, but allow me, if you

7 would, to just remind you of a couple of

8 suggestions to hopefully make things go smoothly

9 from here on out, okay?  Yes?

10      **A.**    Yes.

11      **Q.**    That's one of them, is if you could do

12 a verbal response, because a head shake isn't going

13 to be able to be transcribed, okay?

14      **A.**    Correct.

15      **Q.**    Great.  I'll try to do my best,

16 particularly since we're proceeding on Webex, to

17 wait until the end of your response before I give

18 you a question.  If you could do your best to wait

19 until the end of my question before you give an

20 answer, okay?

21      **A.**    Very good.

22      **Q.**    Are you -- can you hear me okay?

23      **A.**    I am -- that's better.

1      Q.    All right.  I will try to speak up, but

2  please, obviously let me know if you can't hear my

3  question, okay?

4      A.    In fact, if I don't understand it, I'll

5  ask you to repeat it.

6      Q.    And if you can't hear me.

7      A.    Right.  Right.

8      Q.    Okay.  So I previously deposed you

9  relative to the lawsuit against Mr. Thomas, so I

10  have the benefit of having gone through some of the

11  background information with you about marital

12  status and things like that, so I am going to skip

13  over most of that and just kind of update things

14  since the last time I took that deposition, which I

15  think was the fall of 2019, does that sound right

16  to you?

17      A.    August '19?

18      Q.    I said fall 2019?

19      A.    2018 August is the last time you

20  deposed me?

21      Q.    No, I said the fall of 2019; is that

22  your recollection?

23      A.    Fall of 2019 what?

1      **Q.**     Was the last time that I took your

2  deposition relative to the Dublino versus Thomas

3  lawsuit?

4      **A.**     I don't recall, but I remember we did

5  depositions on that particular occasion.

6      **Q.**     All right.  Well, I guess since then

7  have you been -- have you gotten married?

8      **A.**     I have not.

9      **Q.**     Have you obtained any additional

10 education since then in October 2019?

11     **A.**     No, just normal law library access to

12 learning the -- learning about litigation.

13     **Q.**     Okay.  And you were reconvicted in

14 April of 2021 after a bench trial in Erie County;

15 is that correct?

16     **A.**     That is correct.

17     **Q.**     All right.  And what were the specific

18 crimes that you were convicted of?

19     **A.**     I was -- I was convicted of Penal Law

20 120.05-7.

21     **Q.**     Do you know what the name of that,

22 what the charge was?

23     **A.**     It is assault -- assault in the -- in a

1    correctional facility.

2        **Q.**   Do you intend to appeal that

3    conviction?

4        **A.**   I am working on it, that's CPL 333

5    right now, to set it aside based on legal

6    insufficiency and the other, which is just

7    referring to that, it's not only was legal

8    insufficiency, but the evidence was -- I guess the

9    weight of the evidence.

10       **Q.**   Okay.  What was the document you looked

11   at just now?

12       **A.**   I just looked at a case cite, Jennifer

13   Marshan, which outlines that as a case that was

14   determined over here on the Fourth Department.

15       **Q.**   Okay.  And that conviction was the

16   result of an assault on Joe Terranova on March 9th,

17   2018; is that correct?

18       **A.**   Yes, it is.

19       **Q.**   Since the last time you were deposed in

20   October 2019, have you been convicted of any other

21   crimes?

22       **A.**   No, I have not.

23       **Q.**   And have you been exclusively

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

12

1  incarcerated at Wende and Auburn since October

2  2019?

3       **A.**   I -- my incarceration was started in

4  March of 2018 at Elmira Correctional Facility.  In

5  April I went to Auburn Correctional Facility of

6  2018, and I stayed there until October 29th of 2018

7  at Auburn and then I was transferred over to

8  Wende --

9       **Q.**   Okay.

10       **A.**   -- in 2020.

11       **Q.**   Are you currently working at Wende in

12  any capacity?

13       **A.**   I have hall squad duty.

14       **Q.**   What is it?

15       **A.**   Hall squad duty is what my job

16  classification is.  When they call me.

17       **Q.**   So what do you do?

18       **A.**   It's just a basic maintenance type of

19  stuff that's done on the company that you're at,

20  like garbage and making sure everything is clean.

21  Clean and tidy.

22       **Q.**   Okay.  When you were housed at the Erie

23  County Correctional Facility, did you receive a

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

13

1  copy of the inmate handbook?

2          **A.**   At the Erie County Holding Center?

3          **Q.**   Yes.

4          **A.**   I received a copy of the inmate

5  handbook, yes.

6          **Q.**   So turning to the incident that brings

7  us together here, it's my understanding that it

8  happened on March 9, 2018 at approximately 10:20 in

9  the morning; is that accurate?

10         **A.**   Approximately at 10:20, yes.

11         **Q.**   Okay.  And what -- and it occurred in

12  or around an attorney-conference room; is that

13  right?

14         **A.**   That is correct, attorney-conference

15  room 3.

16         **Q.**   Can you describe the room for me,

17  please?

18         **A.**   The room was a little bit larger than

19  seven-by-seven.  Seven feet by seven feet.

20         **Q.**   Okay.  And what's inside --

21         **A.**   Seven-and-a-half-feet by

22  seven-and-a-half-feet.

23         **Q.**   And what's inside the room?

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

14

1        **A.**    A table and three chairs.

2        **Q.**    And what's the door set -- excuse me,

3    the door setup for the attorney-conference room?

4        **A.**    Well, how could I explain this.  You

5    had one door entering and exiting from the corridor

6    from the -- hold on one second, there's a phone

7    ringing here on my end.

8        **Q.**    Okay.

9

10       (Whereupon, a short recess was taken.)

11

12   **BY MS. MOLISANI:**

13       **Q.**    I think when the phone rang you were

14   describing the doors that are in the

15   attorney-conference room?

16       **A.**    Okay, the -- it's a seven by -- a

17   little more than seven-and-a-half by

18   seven-and-a-half attorney room and they have two

19   doors, one that enters from the corridor from the

20   person who is being held in custody, and then

21   there's a door that enters and exits from the

22   attorney entrance.

23       **Q.**    Okay.

1      **A.**     They're approximately three feet wide.

2      **Q.**     All right.  So the claim of excessive

3  force that you made against --

4      **A.**     I'm sorry.

5      **Q.**     The claim of excessive force that you

6  have made against deputies and sergeants in this

7  case, did that occur on the attorney side door or

8  the inmate side door?

9      **A.**     It happened on the -- the person held

10  in custody, on that corridor side, which was my

11  side.

12      **Q.**     The inmate side?

13      **A.**     Where I enter and where I exit.

14      **Q.**     Great.  Okay, and am I correct, if

15  you're inside the room, you cannot open the door

16  yourself, is that right, you have to be let out

17  from someone in such control?

18      **A.**     Yes, there is an electronic release

19  that's controlled by the control room officer.

20      **Q.**     Okay.

21      **A.**     That's correct.

22      **Q.**     And are those rooms exclusively for

23  meeting with attorneys, to your knowledge?

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021

16

1      A.     They are exclusively for attorneys from
2  my knowledge.
3      Q.     Are there rules governing your conduct
4  in those rooms, to your knowledge?
5      A.     No, I have never saw any rules for
6  conduct.
7      Q.     So on March 9, 2018, you were meeting
8  with the attorney that had been representing you
9  for some underlying criminal charges, Joe
10 Terranova; is that right?
11     A.     What was the date, because I did not
12 hear the date?
13     Q.     March 9, 2018.
14     A.     That's correct, I was meeting with my
15 attorney, Joseph Terranova.
16     Q.     And you had recently been convicted of
17 some crimes that Mr. Terranova had been
18 representing you for?
19     A.     Yeah.  Well, you already asked me that
20 question, I gave you the charge and it had to do
21 with Mr. Terranova, yes.
22     Q.     Well, I am not talking about the most
23 recent criminal conviction, I am asking about the

MR. DUBLINO    -    MS. MOLISANI    -    6/7/2021

17

1  charges that Mr. Terranova had been representing

2  you for, the trial that was in front of Judge

3  Haendiges?

4         **A.**    Okay, yes, sorry.  You didn't specify

5  that.  Okay.

6         **Q.**    Okay, so am I correct --

7         **A.**    What was the question again?

8         **Q.**    Sure.  Mr. Terranova had been

9  representing you for some charges that you were

10  recently convicted of in March 2018; is that right?

11         **A.**    That is correct.

12         **Q.**    Okay.  And how long had you been

13  meeting with Mr. Terranova that day before the

14  assault occurred?

15         **A.**    We were in the room for 40 minutes

16  together --

17         **Q.**    Okay.

18         **A.**    -- approximately, but --

19         **Q.**    Up until the point that you assaulted

20  him, had you, those 40 minutes, been contentious in

21  any way?

22         MR. MODICA:  Form.

23         THE WITNESS:  I didn't assault him, I want

1    to correct that.   I defended myself and basically I

2    want to stipulate that.   And what's the next part

3    of that question?

4

5    **BY MS. MOLISANI:**

6         **Q.**   Was there any conflict with him that

7    day, in those 40 minutes that you were meeting with

8    him?

9         **A.**   Yes, there was a conflict.

10        MS. MOLISANI:  And Steve, I don't know what

11   your position is on me asking about that, because I

12   don't know if it's privileged, but if you don't

13   want me to ask him that, that's fine.

14        MR. MODICA:  Yeah, I think because that

15   other charge is still in appeal, I am going to

16   direct the witness not to answer those questions,

17   and obviously the events of this case occurred

18   after that interaction, whatever that interaction

19   was, so on that end, I'd be grateful for that.

20        MS. MOLISANI:  Sure.

21        MR. MODICA:  Thanks.

22

23   **BY MS. MOLISANI:**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

19

Q.    And am I right that about nine days

after the incident on March 9, 2018 -- excuse me,

strike that.   You had sued Mr. Terranova about nine

days before the March 9, 2018 incident; is that

right?

A.    I -- I missed the question.   I pursued

him?

Q.    Sued him.   You made a lawsuit, filed a

lawsuit against him?

A.    Is that what your question is?

Q.    Yes.

A.    I didn't hear the question.

Q.    Okay.

A.    I put a federal lawsuit against Mr.

Terranova, correct.   Out of the -- out of the

district court, the Western District Court for an

issue that took place within the courtroom of

Deborah Haendiges.   There was five claims in this

suit.   He is -- his issue was one of them --

Q.    Okay.

A.    -- along with four other claims in that

suit.

Q.    I am sorry, I thought you were done.

1          **A.**    The claim against Mr. Terranova was

2    that he threatened me inside the courtroom and I

3    objected to it when he did that and the

4    stenographer failed to record that information on

5    my objection, they haven't represented me as an

6    attorney.  This was before the voir dire on January

7    17th, 2018.

8          **Q.**    All right.

9          THE WITNESS:  I'm sorry, Steve, did you say

10   something?

11         MR. MODICA:  I did not.

12         THE WITNESS:  Okay, so January 17th, 2018 he

13   threatened me inside the courtroom and basically I

14   made an objection to the -- to the judge, who was

15   right in front of it while he did this and

16   basically I made an objection to replacing him

17   right there, the stenographer was in the room, and

18   they failed to place my motion on the record.  Do

19   you need to have the information that transpired?

20

21   **BY MS. MOLISANI:**

22         **Q.**    No.  Thank you.

23         **A.**    Okay.

**MCCANN & MCCANN REPORTING**

1      **Q.**   Going back to the morning of March 9,

2  2018, did there come a time in the

3  attorney-conference room where your body came into

4  contact with his?

5      **A.**   Oh, God, it's so hard to hear you.  Go

6  ahead with the question again.  I am trying to

7  concentrate.  Are you turning it up?  Okay.

8      **Q.**   Okay.

9      **A.**   Go ahead.

10     **Q.**   I said going back to the morning of

11  March 9, 2018, did there come a time where your

12  body came into contact with Mr. Terranova's?

13     **A.**   Before March 9th?

14     **Q.**   The morning of March 9th.

15     **A.**   Before the actual alleged incident?

16     **Q.**   No.  Well, I guess I am not sure what

17  you mean by alleged incident.  I just generally

18  want to know on March 9, 2018, did there come a

19  time where your body came into contact with Mr.

20  Terranova's?

21     **A.**   Yes, approximately -- approximately

22  10:20 a.m.

23     **Q.**   Did you strike Mr. Terranova?

1          THE WITNESS:  Okay, Steve, I thought we

2    weren't going to go into that issue.  Are we -- are

3    we going forward with this?

4          MR. MODICA:  Well, again, you can choose not

5    to answer, you know.  Obviously I don't think

6    there's a dispute that there was physical contact

7    between you and Mr. Terranova.  The issue in your

8    criminal case is whether your physical -- your

9    physical conduct was justified.  So that's why I

10   didn't object to that particular question, but the

11   other questions I might object to, but --

12          THE WITNESS:  Okay, repeat the question

13   then, Ms. Molisani.

14

15   BY MS. MOLISANI:

16          Q.    Did you strike Mr. Terranova?

17          A.    I defended myself after he struck me.

18          Q.    Right.  And in defending yourself, did

19   you strike Mr. Terranova?

20          A.    I did not strike him, no.

21          Q.    In what manner did your body come into

22   contact with his?

23          A.    I basically grabbed his arm when he

1    jabbed his pen in me, at my hand and poked my hand,

2    and then after he hit me on the side of the head

3    twice with his left arm, I basically defended

4    myself.  I got up and I was blocking myself, and as

5    I was blocking myself, I was pushing him up against

6    the wall and I put my fingers into his eyes to

7    defend myself, disarming him of his pen.

8          Q.    Did you put your fingers in his eyes

9    just once?

10         A.    I kept pressure on -- with my hands

11   over his face and over his eyes as we fell towards

12   the wall where the emergency -- not the emergency,

13   where the notification button is to the -- to the

14   tower.

15         Q.    Okay.  Did any -- at any point that

16   morning did any deputies enter the attorney

17   conference room?

18         A.    No.

19         Q.    All right.  So according to your

20   complaint, you say that Deputy Thompson arrived

21   first at -- in the inmate side of the hall; is that

22   correct?

23         A.    Yes, the first officer with his K-9.

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

24

1        Q.    Can you describe for me what he did

2    when he arrived?

3        A.    I was standing at the door ready to

4    walk out, waiting for the door to open up.  Once it

5    clicked, they open it up and I walked towards the

6    door and he grabbed me by my shirt, but he didn't

7    pull me out, I walked out on my own will, own

8    free-will.  He basically had ahold of my shirt.

9    That's pretty much as I exited.

10       Q.    Can you describe for me what actions

11   Mr. Thompson took that I guess formed the basis of

12   your complaint against him?

13       A.    I am sorry?

14       Q.    Can you describe for me what actions

15   Deputy Thompson took that form the basis of the

16   complaint against him?

17       A.    Yeah, basically, there's a -- there's a

18   few things.  I followed his order to sit down on

19   the ground.  That's what -- that's what his first

20   order was, so I sat down on the ground.  And then

21   he immediately said no, I want you facedown on the

22   ground in a prone position.  He was cursing while

23   he was doing this.  And at me to do it, get down on

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

1  the fucking ground, and I did all of those things.

2  I conceded and did not resist.  He testified to

3  that.  You were there in the courtroom when he

4  testified to that.

5      **Q.**  Did Deputy Thompson use force against

6  you?

7      **A.**  Did he use force against me?

8      **Q.**  Yes.

9      **A.**  Well, what -- what he did was, he was

10  concentrating on my upper body and he lost control

11  of his dog.  His dog was biting at my leg. His K-9

12  dog was biting at my leg and I ended up trying to

13  protect my leg because he was up on my upper back

14  now, I am protecting my leg with my right hand

15  while he was biting at my leg. The dog ended up

16  biting my hand, my right hand.

17      **Q.**  I am sorry, the dog bit your right hand

18  or your leg or both?

19      **A.**  My right hand.  My right hand.

20      **Q.**  So the dog did not bite either of your

21  legs?

22      **A.**  He was biting at my leg.  He was biting

23  at my leg, at my upper thigh and at my buttocks.

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

26

1   My -- and then that's where my hand was, so I put

2   my hand there, you know, to shoo him away and then

3   he bit my hand too.  The officer was pressing down

4   on my back, okay.  He was -- he didn't try to

5   handcuff me at all and basically he was using extra

6   force on my back.

7        **Q.**   Can you describe what he was doing on

8   your back?

9        **A.**   Leaning on my back.  I don't know, I

10  was facedown, but my back -- he was on my upper

11  part of my body.

12       **Q.**   And you described trying to shoo the

13  dog away, so were you moving as Deputy Thompson was

14  leaning on your back?

15       **A.**   I'm sorry?

16       **Q.**   You have described that you were trying

17  to shoo the dog away, so I am asking if you were

18  moving as Deputy Thompson was leaning on your back?

19       **A.**   I was like -- I was facedown.  They

20  just -- I just explained it to you, the dog was

21  biting at my leg and --

22       THE WITNESS:  Go ahead, Steve what did you

23  say?

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

27

1         MR. MODICA:  No, so Mark, if I mute or

2    unmute, you're going to hear a little beep, so I am

3    trying to stay muted so that I am not adding extra

4    noise back here, so if you hear that, that's not me

5    saying anything, that's just the muting mechanism,

6    all right.  I will certainly speak up when I need

7    to, all right?

8         THE WITNESS:  Very good.

9         MR. MODICA:  Okay.

10

11   **BY MS. MOLISANI:**

12        **Q.**   So is it accurate you were moving as

13   Deputy Thompson was leaning on your back?

14        **A.**   I was laying down facedown.  I wasn't

15   moving anywhere.  I was moving my arm to protect --

16   I was just basically, it's a natural reaction to,

17   just to push away, and he was on my back, so I am

18   just showing you so you can see, so if I am

19   facedown, I am shooing away.  You can't see my arm,

20   but basically it was down by my buttocks where my

21   arms are.  The length of my arm.

22        **Q.**   All right, so you just put your arm

23   straight back, almost as if -- it looks like you

**MCCANN & MCCANN REPORTING**

1  were maybe partway to a position you would take to

2  be handcuffed behind your back, is that an accurate

3  description of what you just did with your body?

4      **A.**    Correct, if your hands are to the side,

5  you know, and then eventually you're going to be

6  handcuffed, you know, so they're going -- only

7  going to go a short distance from where they are on

8  the side.

9      **Q.**    Okay.  The dog was leashed; is that

10  correct?

11      **A.**    Yes, he was.

12      **Q.**    Did there come a time where Deputy

13  Thompson did not have -- was not holding the leash?

14      **A.**    It didn't appear.  He had to have the

15  leash, because the dog was not in the camera, not

16  in the surveillance.  He wasn't in the surveillance

17  camera, but the dog is there because you see him

18  running.  You see him running.

19      **Q.**    I guess --

20      **A.**    I don't know what's going on.  Am I

21  getting back -- back noise?  He was running down

22  the hallway with the dog, so we know the dog is

23  there, but the camera, surveillance camera doesn't

1   cover the entire view of the corridor.  For some

2   reason this is two to three feet from the ground

3   up, so you don't see the dog and that's why you

4   don't see the dog in the photos, but you see the

5   dog in the video until he's out of the -- out of

6   the video screen.

7        **Q.**   I understand that.  I guess what I am

8   trying to get from you is whether, if you know, the

9   dog, if the dog leash was ever out of Deputy

10  Thompson's hands?  And if you don't know, that's

11  fine too.

12       **A.**   Oh, I don't know.

13       **Q.**   Okay.  You're not claiming that the dog

14  was instructed to bite you, are you?

15       **A.**   No.

16       **Q.**   Did Deputy Thompson handcuff you?

17       **A.**   I -- I don't know, I was facedown.

18       **Q.**   And what's your recollection of how

19  many times you were bitten by the dog?

20       **A.**   He was biting at my leg and he bit my

21  hand the one time and then -- and then the other

22  officers got there, they were grabbing my hand and

23  arms, bending my arms behind my back, so I don't

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021

30

1  know after that point.  There was additional

2  officers that were on the scene now.

3      Where the excessive force is, is that Deputy

4  Thompson had control of me down on the ground.  He

5  could have called off the dog, no pun intended, off

6  the dogs that were running down on me, which was

7  about six, six or seven deputies and he didn't do

8  any of that.

9      Q.   Just to clarify, when you say call off

10  the dogs, you're not talking about the narcotic

11  dog, you're talk about the other deputies?

12      A.   That's correct.

13      Q.   Okay.

14      A.   They were running, they ran down the

15  hall.  It's in the video.  And basically they ran

16  down on the hall out of control, jumping on me and

17  doing whatever.  I don't know who had my arms or

18  who didn't have my arms, but there was six officers

19  on top of me because they're on the screen, there's

20  nowhere else they could be but on the top of me,

21  because the camera has a full view of the room, of

22  the hallway, excuse me, the four foot wide hallway,

23  except for two to three feet, so everybody had to

**MCCANN & MCCANN REPORTING**

1   be on top of me at some part of my body.

2        Q.    Okay.  The next person that I want to

3   talk about is Sergeant Biegaj?

4        A.    That's correct.  Yeah.

5        Q.    Can you describe for me what he did?

6        A.    Well, just from reviewing the video,

7   and this is how I can recollect, that he came -- he

8   was the first officer to arrive after Deputy

9   Thompson and he went down on his knees on my back

10  and one of his knees must have struck the floor.

11       Q.    Went down on his knees, did you say on

12  your back?

13       A.    Yes.

14       Q.    Do you know which of his knees was on

15  your back or was it both?

16       A.    I was facedown, I don't know.  I am

17  only going by with the film, what's in the film and

18  on the film.  He was jumping.  You could see he was

19  jumping and then a couple minutes later, a couple

20  seconds, not minutes, a couple seconds later he's

21  -- he's hopping around down the hallway supposedly

22  with some type of injury from -- from falling on

23  his knee.

1      Q.    Okay.  And you were facedown when this

2  occurred; is that right?

3      A.    That is correct.

4      Q.    Okay.  And so how was it that you know

5  that it was Sergeant Biegaj who did this?

6      A.    The film.  I watched the video.  I put

7  together twelve felony complaints and I submitted

8  it to the district attorney's office of what they

9  did, because I was already in the prone position

10  and he certainly wasn't reaching down to handcuff

11  me.  He was -- he's jumping down.  You can see he's

12  running down on me.

13      Q.    Did you know Sergeant Biegaj before

14  March 9, 2018?

15      A.    I certainly did.

16      Q.    What about Deputy Tompson, did you know

17  him before the date of this incident?

18      A.    Deputy who?

19      Q.    Thompson.

20      A.    Did not.  Never interacted with Deputy

21  Thompson.

22      Q.    And have you described everything that

23  Sergeant Biegaj did that you claim was excessive

1   force?

2       **A.**   Yeah, he put his knee on my back when I

3   was in a prone position.

4       **Q.**   Your complaint then says that Deputy

5   Shawn Wilson and Sergeant Dee grabbed your hands

6   and arms and were bending and twisting them in an

7   abnormal fashion; is that accurate?

8       **A.**   Yeah.

9       **Q.**  Okay.  Did you know Deputy Wilson and

10  Sergeant Dee before the date of this accident -- or

11  excuse, me incident?

12       **A.**   I knew Sergeant Dee.  I also knew

13  Deputy Wilson, but no interaction.  But I had

14  interactions with Sergeant Dee.

15       **Q.**   Okay, can you break it down for me

16  between those two individuals, who did what?

17       **A.**   I was facedown.  They were -- they were

18  part of the report, the report that I read for the

19  disturbance.  They were saying that they were

20  grabbing my arms.  Only takes about, if you're in a

21  prone position and your hands are behind the back,

22  you only need to put the handcuffs on, it takes

23  about five seconds to put the handcuffs on you and

1   then pick you up.  I was down on the ground for a

2   minute, 20 seconds facing down.

3        Q.    What report are you talking about?

4        A.    I'm sorry?

5        Q.    What report are you talking about?  You

6   said that it was in the report?

7        A.    The -- Sergeant Smaziak, he's the

8   investigative reporter, he did a report on -- on

9   each one person and who grabbed what and how they

10  grabbed my arms and, you know, how they picked me

11  up.  It was in -- it's in his report.

12       Q.    Are you talking about the Erie County

13  Sheriff's Office Inmate -- or excuse me, Incident

14  Report?

15       A.    It's an incident report, yeah.  I mean,

16  again, like I said, I don't have that in front of

17  me --

18       Q.    I understand.

19       A.    -- but I know that Sergeant Smaziak put

20  it together.

21       Q.    All right.  And does -- well, strike

22  that.  Can you describe for me what Shawn Wilson

23  did that twisted your arms in an abnormal fashion?

1     **A.**   Again, the handcuffs were -- were not

2   put on me right away, then they put them on me,

3   okay, and then they said take them off, put them on

4   the other way.  So not only did they put the

5   handcuffs on me, but they twisted the arms around,

6   okay, and did them the opposite direction bending

7   my shoulders back, which forces you in another

8   position.

9          Now, while this is all happening, they're on

10  top of me, and if you can picture this, okay,

11  because I'll never forget it, is that you're in a

12  prone position, you're down and there's about six

13  guys who weigh about 200 plus, 220 pounds each on

14  average, and I can't breath while this is all

15  happening, and I know what they're doing and I am

16  saying, I can't breath, I can't breath, you have

17  got to get off of me, okay, and they're doing this

18  and they put the handcuffs on and I hear someone

19  say, take them off, put them on again, put them on

20  the opposite way, and that's what they did, they

21  put them on the opposite way.  That's how I ended

22  up with the markings on the opposite side of my

23  wrists.

1      Q.    What do you mean, put them on the

2  opposite way?

3      A.    Well, if your hands are behind your

4  back in a normal position, your palms will be

5  facing out in a normal, behind you.  If you put

6  your hands behind your back, you'll see what I am

7  talking about.  Put -- why don't you try it.

8      Q.    No, thank you.

9      A.    Put your -- you don't want to, okay,

10  yeah, because it's uncomfortable.

11      Q.    I understand what you're saying.

12      A.    Now -- now I want you, if you could do

13  it, put your hands, now your hands are against your

14  back, your palms are now not out anymore, facing

15  out, they're facing in.  That's means they're

16  reversed, okay, that's what I'm talking about.  So

17  they reversed the hands and the arms.  They twisted

18  them out.  They twisted them around.

19      Q.    Okay, so did they remove all the

20  handcuffs and then the reapplication, did that

21  occur in that minute and a half that you said that

22  you were on the ground?

23      A.    That is correct.

1        Q.    Okay.  And the abnormal fashion, you're

2   -- you're talking about flipping your hands in the

3   opposite direction that they had been?

4        A.    As I just said, the palms, your natural

5   motion with your arms behind your back, your palms

6   are out, okay.  And if you flip your hands, and now

7   your hands are behind your back, you'll see that

8   the -- it's not normal and basically that's the

9   reason why they did it is because now they can --

10  they had the pressure of the handcuffs against the

11  bone of my wrists.

12       Q.    Okay.  Do you know who instructed the

13  handcuffs to be flipped around?

14       A.    I -- I know his voice, you know, there

15  was plenty of thing going on, but I am almost very,

16  very certain that it was Sergeant Robinson.

17  Sergeant Robinson is the person who said take the

18  cuffs off, put them on the other way.

19       Q.    Okay.

20       A.    And I know his voice because I have

21  heard Sergeant Robinson many times.  Many, many

22  times.

23       Q.    And so who took the cuffs off and put

1   them on the opposite way?

2       **A.**   I don't know, my face was facedown.   I

3   don't know.

4       **Q.**   Well, what I am trying to get at is,

5   what the claims against Shawn Wilson and Sergeant

6   Dee are, and you have described bending and

7   twisting your arms in an abnormal fashion in the

8   complaint, and so I want to get the information

9   about what the claims are against those two

10  individuals?

11      **A.**   I just said.   I just said, I'm in a

12  prone position for a minute and 20 seconds.   It

13  takes five to ten seconds at the most to put

14  handcuffs on, okay, and if that's the case, then

15  what were you doing for a minute and 20 seconds

16  while -- while the defendant is defenseless.   While

17  the, excuse me, the plaintiff is defenseless.

18  Myself as being the plaintiff.   Defenseless and

19  they're putting the cuffs on and taking them off

20  and they're bending the arms back.   That's all I

21  can tell you.

22      **Q.**   And that was Shawn Wilson and Sergeant

23  Dee that did that?

1        **A.**    The officers that were in the screen

2    that were on top of me and then disappear, were

3    Deputy Thompson, Deputy Biegaj, Sergeant Dee,

4    Deputy Wilson, Sergeant Robinson and Deputy

5    Scarpace, which should have been listed, but I

6    didn't have his name at the time.   Those people

7    were -- there were six individuals on top of me.

8        **Q.**    All right, so it sounds like you did

9    like a process of elimination and went by the video

10   and who was off camera at the time that you were

11   -- that you believe that you were handcuffed based

12   on the cameras; is that right?

13       **A.**    It has to be.   They were there and then

14   they were -- then they weren't there.   They didn't

15   run down the hall because the camera would have

16   picked them up in the hall.   They had the view of

17   the camera -- the view of the cameras shows the

18   length view of the hallway, so -- and it has two

19   cameras going and coming.   They're not inside --

20   they're not -- they're not down the hall.   They're

21   not running down the hall.   They have to be on top

22   of me where the camera is completely shielded for

23   that two to three feet section of the four foot

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

40

1   area.

2        Q.   Regarding Sergeant Cross, you claim he

3   was stomping on your feet and legs; is that

4   correct?

5        A.   Based on the camera.  Based on the

6   camera view, you can see Sergeant Cross rocking.

7   He's not standing there watching, he's actually

8   rocking.  You can see him moving side to side,

9   okay.  Somebody was stepping on my feet.  He was by

10  my feet.  Later he decides to move in on top of me

11  too and then he disappears.  He's six foot six and

12  he completely disappears.  Again, he's not running

13  down the hall, he's not walking down the hall, he's

14  on top of me doing something.  I don't know, I'm

15  facedown.

16       Q.   Okay.  You say in the complaint that

17  after the restraints were applied, you couldn't

18  breath due to pressure on your back.  Do you --

19  restraints, meaning handcuffs, just to be clear

20  about that?

21       A.   I'm sorry?

22       Q.   The restraints, referring to handcuffs;

23  is that correct?

1      A.    They're handcuffs.

2      Q.    I just want to make sure we're clear,

3  restraints, that I knew what you were talking

4  about?

5      A.    Restraints are handcuffs.  That's what

6  they put on my wrists.

7      Q.    All right.

8      A.    Metal handcuffs.

9      Q.    And was it just Justin Biegaj that was

10 putting the pressure on your back?

11     A.    No, Justin Biegaj, he jumped on me with

12 his knee.  With his knees.  He was the one who came

13 down first on my knees.  He ended up -- this is how

14 I know, he's the one that ends up walking down the

15 hallway away from me jumping up and down,

16 supposedly he twisted his knee or banged his knee

17 against the tile when his -- one of his knees hit

18 the tile.  He stated that on his testimony too.

19     Q.    But I want to know who was putting the

20 pressure on your back?

21     A.    Thompson.  Deputy Thompson, Sergeant

22 Dee, Sergeant Robinson, Sergeant -- or Deputy

23 Scarpace, Deputy Wilson.

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

1      Q.    And is that -- that's, again, based on

2   the video and seeing them outside of the camera

3   view; is that correct?

4      A.    Yeah, if the cameras were positioned

5   better, there would be better transparency.

6   There's no transparency.  The cameras were not in

7   position to pick up all of the activity for

8   whatever reason.  The cameras are there for a

9   reason and they didn't -- they did not pick up the

10  entire action.  It's almost like they -- that's a

11  practice, if all the cameras are all filmed, but

12  you don't -- you always have an area where there's

13  nothing, and if you are facedown, you can't be

14  picked up.  There's no camera.  If that's their

15  procedure, that could be considered deliberate,

16  because if I didn't resist, all they had to do was

17  turn me around put my handcuffs on.

18      Q.    How long was there pressure on your

19  back for?

20      A.    How long were they on for?

21      Q.    How long was the pressure on your back?

22      A.    How long what?

23      Q.    Was the pressure on your back?

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

1      **A.**     How long was the pressure.  I was --

2   they -- I had complete pressure.  I couldn't even

3   breath.

4      **Q.**     My question was how long?

5      **A.**     I was gasping for air.  How long?

6      **Q.**     Yes.

7      **A.**     Up until I was picked up.  They finally

8   picked me up.  They had pressure on my back the

9   entire time, a minute and 20 seconds.

10     **Q.**     You then talked in your complaint about

11  an hour later your arms were wrenched?

12     **A.**     Again, because I was speaking to -- I

13  spoke to Sergeant Robinson many times through my

14  custody there, I could hear him, wrench him, wrench

15  him, which is a wrenching tactic to bend the cuffs

16  and the hands and the arms into the cuffs, by

17  bending the wrists, you're bending them into the

18  cuffs.

19     **Q.**     And where was it that that happened?

20     **A.**     It happened throughout -- it happened

21  throughout the corridors all the way over to the

22  infirmary, and then in the infirmary they did it

23  again in front of the nurses.

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

44

1      Q.    And did you sustain any injuries in the

2  incident on March 9, 2018?

3      A.    I did have injuries.  I was never -- I

4  was never examined by the facility.  Everything was

5  kept in-house.  I had been taken take Erie County

6  Medical Center before and they would not take me to

7  the Erie County Medical Center to put a cross

8  complaint in and to be evaluated on what they just

9  did.

10      Q.    When you say you were never examined at

11  the facility, what facility are you talking about,

12  ECMC?

13      A.    Erie County -- Erie County Holding

14  Center was -- they had a nurse practitioner there

15  who all she did was take my blood pressure.  And

16  actually, one of the photos shows the blood

17  pressure, what my blood pressure was.  There was --

18  one of the photos actually shows what my blood

19  pressure was.  I can pull it out and tell you what

20  it was after being pressed down on the ground

21  because it's right on the printout.

22      Q.    I am sorry, we skipped over a couple of

23  people.  You have a claim against Mr. -- Deputy

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

45

1   Gelster.  Can you describe for me what he did that

2   you're claiming as excessive force?

3        **A.**   Deputy Gelster was -- in the infirmary,

4   he seemed to be escorting me with Deputy Peter

5   Giardina and they basically were behind me on the

6   photos that were taken of me while they were taking

7   photos of my face and side views, right and left

8   side views, along with my hands, and while they

9   were doing this, they were being instructed by

10  Sergeant Robinson to wrench him, and that's why I

11  reacted in pain again, because they were -- they

12  were bending the wrists into the cuffs, and they

13  did so, and you can see their eyes in the photo,

14  it's very clear that they're looking off while

15  they're -- while this is happening.  And it was

16  coming from -- it was from Sergeant Robinson, who

17  was out of the photo picture, off adjacent to where

18  I was sitting.

19       **Q.**   After the handcuffs were -- were

20  removed and then put back on in the more

21  uncomfortable position that you described, at any

22  point were they flipped back to the more

23  comfortable way with your palms up?

**MCCANN & MCCANN REPORTING**

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021

46

1      **A.**    They took them off only to take

2 pictures of my hands and then they put them back on

3 the same way, in the reversed -- in the reversed

4 opposite direction of what your -- what would be

5 normal. Meaning, reversed that your palms are

6 facing out. Excuse me, palms are facing in. Palms

7 are facing in in the unnatural position versus the

8 natural position where your hands are facing out.

9 They cuffed them back with the palms facing in

10 towards your buttocks.

11      **Q.**    You have described for me that you were

12 not examined at ECMC as you wanted to be and I

13 guess I want to go back to that line of questioning

14 and ask you, irrespective of where you were seen,

15 did you sustain any injuries in this --

16      **A.**    Yes.

17      **Q.**    Let me just finish the question.

18      **A.**    Yes, I did have injuries. I put in --

19 I put in medical -- I put in medical slips. They

20 would not take me to Erie County Medical Center.

21 They wanted to keep it in-house.

22      **Q.**    What I want to know is what your

23 injuries are?

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

47

1        **A.**     My injuries were to my wrists, to my

2   arms, to my back, to my shoulders.

3        **Q.**     Can you describe those injuries,

4   please?

5        **A.**     Well, the wrists were -- were totally

6   -- they were almost in a sprain.  I don't even

7   know, there might have been a small fracture, I

8   have no idea.  No X-rays were ever taken.  But my

9   wrists, I could barely move my wrists when they put

10  me in the holding cell in Gulf East.  And my arms,

11  I couldn't even move my arms.  And my shoulder, I

12  still have pain in my shoulder.  My deltoid muscle

13  still is in pain from that day.  I can't -- I don't

14  have any hardly strength to lift my arm up.  I can

15  barely lift it up without pain in the deltoid.

16        You know, my back, you know, my back was in

17  bad shape.  I had no medical.  They did no medical

18  examination, okay, of me.  So there's no way to

19  know whether or not I was hurt.  They did not do a

20  medical evaluation of me.  They did not take my

21  clothes off and take pictures with me naked.  They

22  didn't do anything.  They put me -- they put me

23  back into a cell and they would not allow me to go

1  to the Erie County Medical Center, which is over on

2  Grider Street.

3       They took me over there before when I was

4  attacked by another inmate on October 29th.  So

5  they kept it in-house.  They would not take me out

6  of the facility.  And they did not take X-rays.

7  They did not provide ice for me.  I asked for ice

8  for the swelling.

9       Q.   Where was your swelling?

10      A.   I don't know what else to say.  Huh?

11      Q.   Where was your swelling?

12      A.   Where is my stomach?

13      Q.   Where was the swelling?

14      A.   The swelling.  The swelling was in my

15  wrist.  In my wrist.  In my wrist.  And the pain

16  was in my back and shoulders.

17      Q.   And you have been incarcerated now

18  three different places since the Erie County

19  Holding Center; is that correct?

20      A.   I was incarcerated there 21 months.  Is

21  that your question?

22      Q.   No, my question is, since March 9,

23  2018, you have been incarcerated at three different

*MR. DUBLINO    -    MS. MOLISANI    -    6/7/2021*

49

1   locations since the holding center, correct?

2        **A.**   Yes.  And a few days over at Attica.

3        **Q.**   So at any point since March 9, 2018,

4   have you received medical treatment for your

5   wrists, arms, back or shoulders at any of the

6   facilities that you have been incarcerated at?

7        **A.**   No, I haven't.  Everything healed the

8   way -- the way it was.  I was at the Erie County

9   Holding Center for two weeks by the way, and they

10  did not take me to the hospital for two weeks,

11  until I was removed.  So the incident happened on

12  the 9th and I stayed in the holding cell until the

13  23rd when I was sentenced and then they drove me

14  out, drove me to Elmira.

15       **Q.**   I am going to show you -- all right, I

16  am going to show you what we have marked as Exhibit

17  2 --

18       **A.**   Yeah.

19       **Q.**   -- with today's date on the top right

20  corner, can you see what I am showing you?

21       **A.**   It's today's date, 6/7/21.

22       **Q.**   But can you see what I am showing you?

23       **A.**   Yes.

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

50

1     **Q.**   All right.  And does this first page of

2  Exhibit 2 appear to be a medical note signed by

3  Hend Habir, H-A-B-I-R?

4     **A.**   Yeah.

5     **Q.**   All right.  And it looks like it's an

6  examination that you were seen for complaints of

7  pain in your bilateral hands, right hand middle

8  knuckle slightly swollen with erythema.  Inmate

9  able to make fist, able to move fingers, capillary

10  refill less than two seconds.  Left hand slightly

11  swollen around knuckles with erythema, able to move

12  fingers and close fist.  Capillary refill less than

13  two seconds.  No other injuries noted to hands.  Do

14  you see that?

15     **A.**   Well, I don't see the -- exactly the

16  writing, but you're reading it to me.

17     **Q.**   Okay.  I mean, have you seen a note

18  that sounds like what I just read to you?

19     **A.**   Okay, but the pain in the hands, right

20  hand middle knuckle slightly swollen with -- okay.

21  Able to make a fist.  Able to move fingers.  Less

22  than two seconds.  Left hand slightly swollen,

23  okay.  Able to move fingers.  Close fist.  Other

1   injuries noted to hands.  Also mid to lower back.

2   Right side pain.  Say skins -- skin -- okay, no

3   injury noted to entire back/side/ chest.  Clear.

4         Okay.  All right, so you're saying that that

5   was his report.  I am saying that -- I am saying

6   that the report is false.  That's what I'm telling

7   you.

8         Q.   Okay.  And just for purposes of the

9   record, this is dated 3/9/18 at 7:52 p.m.; is that

10  something you can see?

11        A.   I can see it, yeah.  Yeah.

12        Q.   Okay.  And are you saying you weren't

13  examined at that time or the contents are false?

14        A.   I am saying -- I am saying that, I am

15  telling you right now, that all they did was they

16  talked to me, they never examined me.  And that's

17  on film, where they had me at the holding cell in

18  Gulf East and that footage should have been saved

19  and it wasn't.

20        Q.   Okay, so you're saying that you did

21  meet with somebody, but just the contents of --

22        A.   Yeah, I --

23        Q.   Mr. Dublino, let me finish.  You need

*MR. DUBLINO    -    MS. MOLISANI    -    6/7/2021*

52

1    to let me finish the question, please.

2    **A.**    Okay, go ahead.

3    **Q.**    Thank you.  So you're saying, am I

4    paraphrasing this correctly, that you were seen by

5    an RN at that point, but the contents of there

6    being an examination as contained in Exhibit 2 is

7    not accurate, do I have that right?

8    **A.**    Yeah, because I remained handcuffed.

9    When they walked me to -- there was like a little

10    room in Gulf East where they put everybody in keep

11    lock over at the Erie County Holding Center, they

12    walk you over there handcuffed and you stay

13    handcuffed and I was -- they -- nobody examined me

14    at all.  I stayed handcuffed.  I never -- I never

15    left the call un-handcuffed.

16    **Q.**    Do you see --

17    **A.**    They never examined me.

18    **Q.**    Do you see on Exhibit 2 where it says

19    IM offered no other complaints?

20    **A.**    Like I said, I -- I put in three

21    medical sick requests and they never examined me

22    and they never gave me X-rays.

23    **Q.**    My question is, do you see on here

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

53

1    where it says IM offers no other complaints?

2          **A.**    Inmate offers no other complaints,

3    yeah.

4          **Q.**    Yes, you see that?

5          **A.**    I never -- yes, I do.  Yeah.

6          **Q.**    Did you complain at that time about the

7    injuries you described to me, in the wrists, arms,

8    back, was obviously covered in this, and shoulders?

9          **A.**    Yes, I did.

10          **Q.**    Okay.  I will show you page 2 of

11    Exhibit 2, which is a Refusal of Recommended

12    Medical Care dated 3/10/18.  Do you see what I am

13    showing you on my screen?

14          **A.**    Yeah.  Yeah, I see.  I wrote at the

15    top, and you can see how I couldn't even barely

16    hold a pen, I am not refusing medical care.  I am

17    being denied a visit to the hospital.  Medical

18    exams already were done and I had stated, take me

19    to the hospital.  The medical exams were visual.

20    That's the exam they gave me.  Now they're saying I

21    -- inmate refused to get out of bed for assessment

22    on the housing unit.  The reason being he did not

23    want to get out of bed to be seen.  Yesterday he is

*MR. DUBLINO    -    MS. MOLISANI    -    6/7/2021*

54

1   -- he should -- so he wants to go to the hospital.

2   I think it says he should go to the hospital.

3   Sergeant Weber present for assessment of attempt,

4   instead wrote no, refused to sign the refusal form.

5          Q.    All right, so on Exhibit 2, page 2

6   where -- is this your handwriting that says medical

7   exams were already done and I stated take me to the

8   hospital?

9          A.    Yeah.

10          Q.    Is that your handwriting?

11          A.    That's my writing too, yes.

12          Q.    Okay.  So as of March 10th, 2018,

13   medical exams were already done; is that correct?

14          A.    Medical exams were visual.  I am

15   telling you what the exam was, was visual.

16          Q.    I am asking you, as of March 10th,

17   2018, you wrote medical exams already done, were

18   already done; isn't that true?

19          A.    It says medical exams already were done

20   and I stated, take me to the hospital, okay.  I

21   told you what their exam was, is that they took my

22   blood pressure, okay, and they took photos of me.

23   That was their exam.  That's it.

**MCCANN & MCCANN REPORTING**

1     Q.    And I'm showing you page 3 of Exhibit 2

2  in which you wanted to go to the hospital, an

3  independent hospital visit.  Do you see that first

4  line here on page 3 of Exhibit 2?

5     A.    Right, that's 3/11, yes.  That's 3/11.

6  I am just making sure I have the right one.  I had

7  to rewrite it.  These sick call requests that were

8  -- were given to me by another inmate.  They had to

9  slide it under the door.  They wouldn't give me a

10  sick request.  This is why I was able to write

11  this.

12     Q.    Okay.

13     A.    They weren't giving me pens.  There's

14  three of them actually.  That's -- that's 3/11 at

15  11:45.

16     Q.    And you were in keep lock at that

17  point?

18     A.    Placed three of them.  I was in keep

19  lock, correct.

20     Q.    And you were in keep lock relative to

21  the incident on March 9, 2018; is that right?

22     A.    I'm sorry.

23     Q.    You were in keep lock relative to the

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*
56

1    incident on March 9, 2018; is that right?

2         A.    That's correct, yes.

3         Q.    I am going to show you what has been

4    marked as Exhibit 1 with today's date on the

5    exhibit sticker, and --

6         A.    Yes.

7         Q.    -- that document is entitled Erie

8    County Sheriff's Office Administrative Segregation

9    Order Keep Lock Pending Discipline Hearing.  Do you

10   see this?

11        A.    Yes.

12        Q.    And then there's a box checked, you

13   have been classified as a security risk, do you see

14   that?

15        A.    Yeah.  Yes.

16        Q.    And this is signed by Chief Kuppel on

17   March 9, 2018; is that right?

18        A.    That's correct, pending a disciplinary

19   hearing, so while you're on that document, no

20   disciplinary hearing was ever conducted.

21        Q.    Okay.  The second page of Exhibit 1 is

22   a document entitled Erie County Sheriff's Office

23   Jail Management Disciplinary Report, do you see

**MCCANN & MCCANN REPORTING**

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021

57

1   that?

2        A.   Yes.  Yes, I do.

3        Q.   And this report is dated 3/9/18 and it

4   appears that it was -- that the box checked here is

5   Forward to the Disciplinary Committee.  Do you see

6   that?

7        A.   Yes.

8        Q.   Okay.  And you're saying that there was

9   no -- nothing ever came of this disciplinary

10  report?

11       A.   Yeah.  Why don't you slide it up again.

12  Let's zero in and blow it up where it shows you

13  where the inmates are supposed to sign.  Go back to

14  the disciplinary report and blow it up right there,

15  inmate's receipt.

16       Q.   I can see there's no signature there.

17       A.   Yeah, do you see there where it says if

18  you refuse witness statement.

19       Q.   Yep, and you did not sign it; is that

20  right?

21       A.   Right, because it was never presented

22  to me.

23       Q.   Okay.

**MCCANN & MCCANN REPORTING**

1          A.    When you refuse something, they usually

2    have a witness saying that you refused.

3          Q.    I understand.

4          A.    Okay.

5          Q.    All right, and you were transferred out

6    of the Erie County Holding Center when?

7          A.    I'm sorry?

8          Q.    You were transferred out of the Erie

9    County Holding Center when?

10          A.    I was transferred out of the Erie

11    County Holding Center on March 23, 2018.

12          Q.    Okay.  So approximately two weeks

13    later, after this incident?

14          A.    Two weeks later exactly, yep.

15          Q.    So we know from the sick call requests

16    that even in keep lock you had a pen; is that

17    correct?

18          A.    They would not give me a pen or the

19    medical slips.  As I said, in Gulf East they have

20    cameras and the cells are, I was in a corner cell

21    and the inmate that was over at this corner cell

22    (indicating) asked for sick call slips, sick call

23    requests, and he slid them over to me and slid his

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*
59

1  pen over to my cell, sliding it over.  That's the

2  only reason why I was able get a pen, otherwise

3  would have never had sick call requests made.

4         Now they told me after, I wanted to fill out

5  additional slips and grievances and they would not

6  allow him to give me any more pens.  They said do

7  not slide him any more pens.  They didn't even give

8  me a grievance form.

9         **Q.**    Did you file a grievance against any of

10  the deputies involved in this incident?

11         **A.**    They never would give me a grievance

12  form.

13         **Q.**    When did you ask for a grievance form?

14         **A.**    Immediately.

15         **Q.**    On March 9, 2018 or some point after

16  that?

17         **A.**    The 9th, when I first -- when they

18  first threw me into keep lock I was asking the

19  officers that were working the floor to get me a

20  grievance and they didn't.

21         **Q.**    You were aware of the grievance

22  procedure; is that correct?

23         **A.**    I'm sorry?

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

1     **Q.**   You were aware of the grievance

2  procedure; is that correct?

3     **A.**   Oh, yes.  Yes.  Yes.

4     **Q.**   At any point after March 9, 2018, but

5  before you were transferred, in those two weeks you

6  were still at the holding center, did you file any

7  grievances for any issues?

8     **A.**   As I said, they would not give me a

9  pen.  I had to borrow the pen.  They would not give

10  me a grievance form.  I had no paperwork.  They

11  didn't even give me my legal material for about

12  almost a week.  They -- they gave me nothing.  I

13  had nothing.  Nothing.

14     **Q.**   My question is, did you --

15     **A.**   Like I said --

16     **Q.**   My question is, the two weeks after

17  this incident, but before you were transferred, did

18  you file a grievance for any issue at the holding

19  center?

20     **A.**   They wouldn't -- I was not -- they did

21  not give me the paperwork to provide for

22  grievances.

23     **Q.**   So your answer is no?

61

1      **A.**    That's correct, no, I did not.  They

2   didn't provide it for you.  When you're in keep

3   lock, you don't have free movement.  You have to be

4   provided the form and that's under camera too.

5   That's all surveillance footage.

6          MS. MOLISANI:  All right, I am all set.

7   Thank you for your time.

8          THE WITNESS:  All right.

9          MR. MODICA:  Thank you, Erin.

10          MS. MOLISANI:  Thank you.

11

12   (Whereupon, the deposition concluded at 11:22 a.m.)

13                *             *             *

14

15

16

17

18

19

20

21

22

23

```
 1  STATE OF NEW YORK)

 2                    )  ss.

 3  COUNTY OF ERIE    )

 4

 5

        I, Denise C. Burger, Notary Public, in and
 6  for the County of Erie, State of New York, do
    hereby certify:
 7

 8      That the witness whose testimony appears
    hereinbefore was, before the commencement of their
 9  testimony, duly sworn to testify the truth, the
    whole truth and nothing but the truth; that said
10  testimony was taken pursuant to notice at the time
    and place as herein set forth; that said testimony
11  was taken down by me and thereafter transcribed
    into typewriting, and I hereby certify the
12  foregoing testimony is a full, true and correct
    transcription of my shorthand notes so taken.
13

14      I further certify that I am neither counsel
    for nor related to any party to said action, nor in
15  any way interested in the outcome thereof.

16

        IN WITNESS WHEREOF, I have hereunto
17  subscribed my name and affixed my seal this _____
    day of _____, 2021.
18

19

    ---------------------------
20  Denise C. Burger,
    Notary Public,
21  State of New York, County of Erie
    My commission expires 7/25/23
22

23
```