# EXHIBIT D

1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - x

MARK T. DUBLINO

    Plaintiff

    -vs-

SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

DEPUTY BRIAN THOMPSON, DEPUTY FRANK

GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

    Defendants

- - - - - - - - - - - - - - - - - - - - - - - X

    Civil Action No. 6:19-cv-6269-DGL


    Deposition of FRANK GELSTER taken pursuant to
notice via videoconference on Wednesday, June 9, 2021
commencing at 11:29 a.m.


Reported by:

COMPUTER REPORTING SERVICE

Shari L. Vitalone

16 East Main Street, Suite 7

Rochester, New York  14614     (585) 325-3170

2

2   APPEARANCES:

3      MODICA LAW FIRM

4      By:   STEVEN V. MODICA, Esq.

5      2430 Ridgeway Avenue

6      Rochester, New York   14626

7      Attorneys for plaintiff.

8

9

10      ERIE COUNTY DEPARTMENT OF LAW

11      By:   ERIN MOLISANI, Esq.

12      95 Franklin Street, Suite 1634

13      Buffalo, New York   14202

14      Attorneys for defendants.

15

16

17

18

19

20

21

22

23

24

25

3

2                        INDEX

3   Frank Gelster

4       Examination by Mr. Modica            4 - 34

5

6

7   Reporter Certificate                        35

8   Witness Certificate                         36

9   Errata Sheet                                37

10

11

12   (No exhibits marked.)

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1        F. Gelster - Examination by Mr. Modica

2               FRANK GELSTER

3    called herein as a witness, being duly sworn,

4             testified as follows:

5  EXAMINATION BY MR. MODICA:

6     Q.    Good morning, Deputy Gelster.  My name is

7  Steve Modica.  I am the pro bono counsel for Mark

8  Dublino.  I appreciate your appearance here today.

9     I'm going to ask you some questions.  Please answer

10  those questions to the best of your ability.

11     If you don't understand those questions certainly

12  feel free to ask me to rephrase it, and because we're

13  doing this virtually it's really important that we wait

14  until each other is finished before speaking again.

15     So I'm going to try to be real patient and not

16  interrupt you and I'm hoping you will do the same.

17     Is that okay?

18     A.    Okay.

19     Q.    All right.  So you're currently employed in

20  the jail management division?

21     A.    I am.

22     Q.    How long have you worked for them?

23     A.    Approximately fifteen years.

24     Q.    If you can keep your voice up a little bit,

25  I'm having a little bit of trouble.

5

1          F. Gelster - Examination by Mr. Modica

2     All right.  And during 2018 did you work for them?

3     A.    I did.

4     Q.    And where were you doing your work at that

5  point?

6     A.    I want to say -- I believe I was still in the

7  visiting platoon at that time.

8     Q.    In kind of broader terms you were working at

9  the Erie County Holding Center?

10    A.    Yeah, holding center.  I'm sorry.

11    Q.    Were you working at the Erie County Holding

12  Center on March 9th of 2018?

13    A.    I was.

14    Q.    What was your job or assignment that day if

15  you recall?

16    A.    Escort I believe.  It was a while ago.  I've

17  had a lot of jobs since then.

18    Q.    I can represent to you that the documents do

19  indicate you being an escort at the time.  So let's

20  assume that.

21    Describe for me what your duties were as an escort.

22    A.    General duties every day are the same for

23  that job, escort inmates to medical, to visitation, to

24  other areas of the jail.

25    In normal matters, just an escort, and some of them

6

1          F. Gelster - Examination by Mr. Modica

2     are handcuffed so -- it depends on the inmate, but in

3     general you're part of a response team if something

4     goes down as well and to escort inmates throughout the

5     jail.

6          Q.    Do you recall any interactions with inmate

7     Dublino before March of 2018?

8          A.    Nothing.  I mean, I knew who he was, but

9     nothing of consistence, nothing of -- what's the word

10    I'm looking for?

11         I didn't really know him.  I just knew him from

12    being in jail.

13         Q.    So nothing stood out in your mind -- any

14    interactions with him positive or negative, nothing

15    stands out in your mind before March of 2018?

16         A.    No, not that I can recall.

17         Q.    We know you did have some interactions with

18    him on March 9th of 2018 which is the basis for this

19    case.

20         Are you aware that there's a video that shows at

21    least part of your interactions with him?

22         A.    I've been unable to see the video so I'm not

23    sure what's in it, but yes, I know there was videotape

24    because there's video in that hallway down there.

25         Q.    Actually, I have the video so I'm going to

7

1          F. Gelster - Examination by Mr. Modica

2    share the screen and have you take a look at the video,

3    and if you want me to move any part of it or anything

4    like that -- I'll show it straight through and then if

5    you want to refer to any parts of it during your

6    testimony, that would be fine.

7        It's only about three minutes long so it will be a

8    little quiet here.

9        A.     Okay.

10       Q.     First of all, are you able to see the screen

11   I've shared?

12       A.     I am.

13       Q.     This is at the beginning of the video.  I'm

14   going to hit play and I will be quiet for the next

15   three minutes or so.

16   (Deposition Exhibit A played.)

17        Okay.  That's the complete video, Deputy Gelster.

18   Were you able to see that?

19       A.     Yeah.

20       Q.     Great.  Okay.  And would you say that does

21   depict at least part of your interaction with Mr.

22   Dublino on March 9th of 2018?

23       A.     Yes.

24       Q.     Did there come a time when you prepared a

25   memorandum about this incident?

8

F. Gelster - Examination by Mr. Modica

1      A.    What do you mean?

2      Q.    Did you put anything in writing about your
role in this incident?

3      A.    Oh, I would have had to fill out a pink sheet
and likely a Use of Force form.

4      Q.    And by "pink sheet," can you describe what
you mean by that?

5      A.    It's a form we fill out where you describe
basically what your interaction was in the incident.

6      Q.    And I'm sorry if I didn't note it earlier for
the record.  The video we showed Deputy Gelster was
Deposition Exhibit A.

So I'm going to show you now what we've marked as
Deposition Exhibit H.  Do you recognize that document?

A.    Yes.

Q.    Is that the pink sheet so to speak that you
referred to?

A.    Yes.

Q.    And do you recall about when you prepared
this document?

A.    It would have been later that day at some
point.  I'm not sure exactly.

Q.    And why did you prepare that document?

A.    We do it to document things.  So, for

F. Gelster - Examination by Mr. Modica

1        instance, such as this to state what has happened.

2        Q.    And did you also prepare a Use of Force

3        report with respect to this incident?

4        A.    I cannot recall.

5        Q.    I'm showing you what we've marked as

6        Deposition Exhibit I.

7        A.    Then yes, I did.

8        Q.    Do you recognize that document?

9        A.    Correct.

10       Q.    Is that a Use of Force report regarding the

11       incident with Mr. Dublino on March 9th of 2018?

12       A.    Yes.

13       Q.    And why did you prepare Deposition Exhibit I?

14       A.    That's part of our orders as well.  The pink

15       sheet and whenever mechanical restraints or contact is

16       made the Use of Force is filled out as well.

17       Q.    And the memo, Deposition Exhibit H, and the

18       Use of Force report, those complete your documents as

19       best as you recall?

20       A.    Yes.

21       Q.    What is a 10-99?

22       A.    A 10-99 is a staff incident where a staff is

23       in trouble whether it be with an inmate or otherwise.

24       Q.    And is there a policy as far as you know as

10

1           F. Gelster - Examination by Mr. Modica

2    to what you or anybody in the facility is supposed to

3    do when you get a 10-99 call?

4        A.     As far as an actual policy, I don't know I'm

5    versed in it.   I'm sure there is one.

6        As an escort I was primarily responsible for any

7    incident in the jail.

8        Q.     Whether or not there's a written policy, what

9    did you understand at that point was your

10   responsibility if any when you get a 10-99 call?

11       A.     To respond and stop whatever -- you know,

12   protect whatever is happening, to stop it from

13   happening - that being in whatever manner needed.

14       Q.     In March of 2018 if you know was there a code

15   that dealt with interactions between -- or altercations

16   between a person in custody and their lawyer?

17       A.     I believe it would still be called a 10-99 as

18   far as any kind of like staff or visitor per se.

19       Q.     All right.   And on March 9, 2018 how did you

20   get the 10-99 call?

21       A.     Over the radio.

22       Q.     And when you say "Over the radio," was that

23   the radio you wore on your body or the PA system or

24   both?

25       A.     It may have been both, but definitely on the

11

1          F. Gelster - Examination by Mr. Modica

2    radio.

3          Q.    If you recall where were you at the time you

4    got that 10-99 call on March 9th, 2018?

5          A.    I cannot recall.

6          Q.    Do you remember where the call directed you

7    to go?

8          A.    To the attorney visiting area.

9          Q.    And what if anything did you do?

10          A.    When I responded?

11          Q.    As soon as you got that call that tells you

12    to go to the attorney conference room, what do you do?

13          A.    I head towards the call.

14          Q.    In the part we reviewed you earlier, does

15    that depict you responding in some way to this call?

16          A.    It would, yes.

17          Q.    Do you recall when you watched the video

18    seeing yourself on the video?

19          A.    I do.

20          Q.    When you began to go toward attorney

21    conference room 3, when you arrived there what did you

22    see?

23          A.    I had seen the people ahead of me more than

24    anything.

25          Inmate Dublino was laying on the ground, but he was

1        F. Gelster - Examination by Mr. Modica

2    surrounded by a lot of people.  So as far as what was

3    going on there, I can't speak to that.

4        So when I got there he was laying on the ground.  I

5    honestly at this point in time cannot recall what he

6    was saying or -- as far as that goes.

7        Q.    So let me take it back for a second.

8        When you saw him on the ground was he face up, face

9    down or sitting down?

10        What was he doing?

11        A.    I believe he was face down.

12        Q.    Was there anybody else with him when you saw

13    him first?

14        A.    Well, there was at least ten other people I

15    have to say around him.  So, again, I don't know.

16        Q.    When you first saw inmate Dublino I think --

17    so I'm going to bring you back because I know these

18    events occurred some time ago.

19        So I'm going to bring you back to your memo,

20    Deposition Exhibit H.  The second sentence reads, "Upon

21    arrival I did observe inmate Mark Dublino" - and it

22    lists his number, inmate number - "on the ground being

23    given verbal orders by Deputy Thompson to place his

24    hands behind his back."

25        First, did I read that properly?

13

        F. Gelster - Examination by Mr. Modica

1

2      A.      You did.

3      Q.      Does that refresh your recollection as to

4   what you saw when you first arrived?

5      A.      It does, yes.

6      Q.      And when Deputy Thompson gave him that order

7   did you -- did Mr. Dublino comply with that order?

8      A.      I cannot recall.

9      Q.      And then continuing with your memo it says,

10  "Deputy Wilson and I then took control of inmate

11  Dublino's right arm with both hands and then I

12  proceeded to place mechanical restraints on inmate

13  Dublino's right wrist."

14      Did I read that correctly?

15      A.      You did.

16      Q.      Is that your recollection of what happened?

17      A.      It is.

18      Q.      And it then goes on to say, "I then placed

19  mechanical restraints on inmate Dublino's left wrist

20  which was being secured by Sergeant Dee."

21      Did I read that properly?

22      A.      You did.

23      Q.      Is that consistent with your recollection?

24      A.      Yes.

25      Q.      And then the last sentence says, "Sergeant

1          F. Gelster - Examination by Mr. Modica

2    Dee and I assisted inmate Dublino to his feet and he

3    was escorted to the infirmary for evaluation."

4        Did I read that correctly?

5        A.    You did.

6        Q.    Is that consistent with your recollection of

7    what occurred?

8        A.    It is.

9        Q.    Did inmate Dublino say anything during your

10   interaction with him at that point, again, when you

11   first got to the hallway with the rest of the folks?

12       A.    I cannot recall.

13       Q.    Do you recall him saying at any point that he

14   was having difficulty breathing?

15       A.    I do not recall that, no.

16       Q.    In the interactions you had -- the physical

17   interactions you had with inmate Dublino in securing

18   restraints on his arms, his wrists, did he resist you

19   in any way?

20       A.    If what I remember is correct we did have to

21   forcefully put his hands behind his back.

22       Q.    What makes you remember that you had to

23   exercise force to put the cuffs on him?

24       A.    When I read my pink sheet there, the way that

25   it's written it would have meant that I had to take his

15

1          F. Gelster - Examination by Mr. Modica

2    hand and place it behind his back.

3          Q.     So I don't want to put words in your mouth,

4    but the language that you took control of his right

5    hand, is that the language that indicates to you he did

6    not voluntarily put his hands behind his back?

7          A.     Correct.

8          Q.     Can you explain to me your understanding of

9    how folks that are in custody are supposed to be

10   handcuffed?

11         Is there a preferred way?

12         A.     In a perfect setting, yes.  It would be palms

13   facing out, back of the hands together with the cuffs

14   on.

15         Q.     Just so I understand, hands would be cuffed

16   behind the person's back?

17         A.     Right.

18         Q.     And palms facing outward or away from the

19   center of their body?

20         A.     Correct.

21         Q.     And are there times when people in custody

22   are cuffed differently?

23         So, for example, there was some testimony earlier

24   this week about what was called reverse cuffing where

25   actually instead of the person's palms facing away from

16

F. Gelster - Examination by Mr. Modica

the center of their body, they're actually facing

towards the center of their body.

A.    Yes, there would be.

Q.    Okay.  So help me understand why -- what

circumstances would there be that would warrant that

reverse handcuffing?

A.    Well, sometimes if the cuffs are being placed

in an emergency situation such as that they're placed

on for immediate safety of everybody involved.

Q.    So to be done quickly you might do it that

way versus if you had more time or less resistance?

A.    Right.

Q.    Can you explain to me why did you use force

on Mr. Dublino in the manner in which you did?

A.    To the best of my knowledge it would be

because he was not complying with orders.

Q.    Now, from the time that you initially arrived

at the attorney conference area until Mr. Dublino was

subdued and removed from the area did you hear

Mr. Terranova say anything?

A.    I cannot recall.

Q.    I'll ask you specifically -- there was some

indication at some point Mr.  Terranova said to either

you or some other folks there, "Kick his ass" - being

17

1          F. Gelster - Examination by Mr. Modica

2    Dublino's ass.

3        Do you recall anything like that going on?

4        A.    There was a lot going on.  I can't recall.

5    There was a lot of things said.  It was quite some time

6    ago.

7        Q.    Understood.

8        A.    Nothing that sticks out in my head.

9        Q.    So I also understood that at some point you

10   escorted inmate Dublino after he was handcuffed from

11   the attorney conference area to the infirmary; is that

12   correct?

13       A.    Correct.

14       Q.    And did inmate Dublino say anything to you

15   that you can recall asking to be transported to the

16   infirmary?  Escorted is a better word.

17       A.    Not anything that sticks out in my head that

18   I can recall, no.

19       Q.    So I want to go back to the video and just

20   kind of focus really on you for a moment so I

21   understand it.

22       Okay.  I'm sharing the screen again.  Are you able

23   to see that, Deputy Gelster?

24       A.    Yes.

25       Q.    All right.  So I'm going to start the video

18

1      F. Gelster - Examination by Mr. Modica

2  and would you let me know as far as when you come into

3  our vision.  Okay?

4      A.    Sure.

5      Q.    Great.

6  (Deposition Exhibit A played.)

7      Are you in the picture yet, Deputy?

8      A.    I am, yes.

9      Q.    And is it correct that you're on the left

10 side of the screen or is that someone else?

11     A.    It would appear to be me, yeah.

12     Q.    Okay.  So I'm looking -- I stopped at

13 10:22:45.136 seconds and you would say that that would

14 be you on the left side of the screen.

15     Okay.  Is this consistent with your recollection

16 that you came down the alpha hallway headed toward

17 responding to this event?

18     A.    It would be, yes.

19     Q.    I'm going to continue it through.

20 (Deposition Exhibit A played.)

21     Q.    Now, I stopped it again at 10:22:50.952.  Is

22 that you on the far right?

23     A.    It would appear to be, yeah.

24     Q.    And this box where -- in the attorney visit

25 room A, is that you?

F. Gelster - Examination by Mr. Modica

A.    Correct.

Q.    I'm going to start it again and I believe that's you.

A.    It would appear so, yes.

Q.    And now it would appear you've gone down to the ground, but we can't see you in the frame, and again, I'm looking at the attorney visit room A frame, top right hand side of the video at the time sequence of 10:22 a.m. and 54.055 seconds.

Is that a fair statement?

A.    It is.

Q.    And is there any way from you looking at this still right now to know what you were doing when you went out of the frame there?

A.    From that picture there, nothing.

Q.    And then there are other members of the response team that are visible to us in that frame. Again, we're still looking at attorney visit room A.

So tell me -- at some point the next time you emerge where we can see you, tell me to stop.

A.    Okay.

(Deposition Exhibit A played.)

A.    There I am.

Q.    Is that you right in the front here?  So at

20

1          F. Gelster - Examination by Mr. Modica

2     10:23:53.917 seconds that's you at the front of the

3     picture?

4          A.     It would appear to be, yes.

5          Q.     And, again, do you remember what you were

6     doing at that point when you emerged back into the

7     screen?

8          A.     I believe preparing to stand inmate Dublino

9     up after he was securely handcuffed.

10          Q.     And if I were to represent to you - and I'll

11     keep running the video - that it appears that inmate

12     Dublino is on the ground from the time that Deputy

13     Thompson brings him in until he rises for about a

14     minute and twenty seconds, do you recall of that time

15     how much time you spent handcuffing him or trying to

16     handcuff him?

17          A.     I cannot recall.

18          Q.     Is there a typical amount of time that you

19     would say that it would take to handcuff someone?

20          A.     Every situation differs.  There's no way I

21     could put a time on it, I mean, especially in an

22     emergency situation.

23          Q.     And that could depend, of course, if a person

24     is resisting it might take longer, right?

25          A.     Correct.

1          F. Gelster - Examination by Mr. Modica

2     Q.     I restarted the tape.

3  (Deposition Exhibit A played.)

4     Q.     Now, it looks to me like you're walking away

5  from the area.  Is this you right here the best that

6  you can tell?

7     A.     No.

8     Q.     That's not.  This is you?

9     A.     It would appear so, yeah.

10     Q.     So, again, we stopped it at 10:24:02.228

11  seconds and it would appear that you're on inmate

12  Dublino's right side; is that fair?

13     A.     It would appear so, yes.

14     Q.     And is there anyone on his left side that is

15  similarly holding him or is it just you?

16     A.     It would appear somebody is there.  I cannot

17  tell who that is at this time by looking at the

18  picture.

19     Q.     Understood.  Okay.  And then it appears like

20  you're walking with inmate Dublino away from the

21  attorney conference area headed toward the sally port;

22  is that correct?

23     A.     Correct.

24     Q.     And if you look at the picture on the bottom

25  left it appears like there is something open, the sally

1          F. Gelster - Examination by Mr. Modica

2    port door.

3        Okay.   I stopped it.

4        It appears to show at 10:24:35.842 bottom left side

5    of the screen in the sally port area you to the right

6    of inmate Dublino; is that correct?

7        A.    It would appear so, yes.

8        Q.    Could you tell me if you know, Deputy

9    Gelster, who is behind -- who is the other gentleman

10   behind inmate Dublino?   This gentleman right here.

11       A.    I do not know from this picture.

12       Q.    I'm going to rerun it.   If you're able to

13   tell who that is I'd appreciate it.

14   (Deposition Exhibit A played.)

15       Q.    So it does appear to me - you let me know if

16   you think differently - you're certainly holding inmate

17   Dublino.

18       He's handcuffed at the time, correct?

19       A.    Correct.

20       Q.    And there's at least one other deputy holding

21   him, but we're not exactly sure who that is?

22       A.    Right.

23       Q.    Can you tell from the pictures does it appear

24   like anybody else is holding him?

25       A.    Does not appear so, no.

23

1        F. Gelster - Examination by Mr. Modica

2      Q.    And at this point when you're going out of

3   the alpha hallway, what is your recollection as to

4   where you were going with inmate Dublino?

5      A.    To the jail infirmary to have him evaluated.

6      Q.    Did someone direct you to do that?

7      A.    Generally it would be the sergeant's

8   direction, but usually it's standard procedure to take

9   them and have them evaluated.

10      Q.    And when you visually saw inmate Dublino,

11   cuffed him and then started walking did you observe him

12   to have any injuries?

13      A.    Not to my recollection, no, but I don't know.

14      Q.    To the best of your recollection did he

15   complain of pain in any part of his body, again, from

16   the time you first interact with him until you were

17   walking him to the infirmary?

18      A.    That, I cannot recall.

19      Q.    Okay.  And then best I can tell by 10:24:58

20   or 59 or so you're out of the picture.  So the rest

21   doesn't relate to you; is that fair?

22      A.    Fair.

23      Q.    There are a number of other defendants in

24   this case, as you probably know.  So I'm going to ask

25   you about those folks and what if anything you know

24

1        F. Gelster - Examination by Mr. Modica

2   about their participation in the events of March 9th of

3   2018.

4        So let's start with Deputy Thompson.  What if

5   anything did you observe Deputy Thompson doing on March

6   9th of 2018 in that hallway outside the attorney

7   conference room?

8        A.     Honestly, I can't recall.

9        I know he was there, but what he was doing -- I was

10  focusing more on what the inmate was doing to make sure

11  he wasn't going to get up or do anything like that.

12       So I don't really focus on what the other deputies

13  are doing.  I'm more focused on what I have to do.

14       Q.     Understood.  Is it correct that Deputy

15  Thompson in March of 2018 was responsible for a K-9,

16  specifically a K-9 named Bili?

17       A.     I believe that's his name, yes.

18       Q.     Do you recall whether Bili was in there?

19       A.     As far as my recollection.

20       Q.     Did you notice anything about Bili's

21  interaction with inmate Dublino?

22       A.     I did not.

23       Q.     Inmate Dublino alleged that Bili either

24  scratched him or bit him.  Did you see anything like

25  that?

25

1          F. Gelster - Examination by Mr. Modica

2      A.     To my knowledge, no, I did not see anything

3  like that.

4      Q.     And the response team I believe also included

5  Sergeant Justin Biegaj.

6      A.     I would assume so, yes.  Again, I don't know

7  everybody who was there.  So --

8      Q.     When you watched the video earlier did you

9  notice him?

10      A.     I was not looking for him.  So he may have

11  been in there, but I wasn't looking for him while you

12  were asking about myself.

13      Again, I remember certain people, Thompson, Deputy

14  Wilson, Sergeant Dee, Sergeant Robinson.  So if he was

15  there I cannot say right now.

16      Q.     I'm just asking for what you remember.  Thank

17  you.

18      So inmate Dublino alleges regarding Sergeant Biegaj

19  that he stomped and stepped on him while he was on the

20  ground, that he was targeting his head and back and

21  also put his knee on Mr. Dublino's back.

22      So let me ask you, did you see at any point anyone

23  stomping on inmate Dublino while he was on the ground

24  or putting his knee on his back?

25      A.     I do not recall any stomping, hitting,

         F. Gelster - Examination by Mr. Modica

1    punching, anything like that.

2

3    Q.    I'm going to ask you about Sergeant Robert

4    Dee and Shawn Wilson.

5    Mr. Dublino has alleged that they grabbed his arms

6    and hands and bent them in an abnormal position using

7    extreme pressure.

8    Can you tell me did you witness anything like that?

9    A.    I did not.

10   I know Deputy Wilson and I were attempting to place

11   his arm behind his back.  We're not really -- I don't

12   remember any like retching.

13   I just know when somebody is fighting you it's more

14   work to get it back there.  So --

15   Q.    Do you recall how initially -- well, first of

16   all, when you arrived do you recall initially how

17   inmate Dublino was handcuffed?

18   A.    I do not.

19   Q.    Okay.  Do you recall if the handcuffs were

20   removed and changed at any point before you left the

21   hallway outside the attorney conference room?

22   A.    Before he was escorted to the infirmary?

23   Q.    Yes.

24   A.    I cannot recall if they were adjusted or not.

25   It's not SOP to adjust the cuffs.  I know before

1       F. Gelster - Examination by Mr. Modica

2   getting up there until he's evaluated in medical they

3   come off or after the inmate calms down.

4       Q.    And, again, just for purposes of the record

5   SOP means standard operating procedure, correct?

6       A.    Yes.

7       Q.    Sergeant Matthew Cross, do you recall whether

8   he was among the group that responded?

9       A.    Only because I did remember seeing him on the

10  video.

11      Q.    And inmate Dublino alleges that Sergeant

12  Cross stood directly over him and began stomping on his

13  legs, ankles and his feet.

14      Did you see anything that looked like that?

15      A.    Again, I don't recall any stomping, striking.

16      Q.    Inmate Dublino also makes some allegations

17  regarding Sergeant Jack Robinson and Deputy Pete

18  Giardina as it relates in part to you.  So let me

19  explain that a little bit.

20      At some point did Sergeant Robinson tell you to

21  retch inmate Dublino's arms in some way?

22      A.    Not that I recall, no.

23      Q.    Now, did there come a time when pictures of

24  inmate Dublino were taken soon after the altercation on

25  March 9th of 2018?

28

F. Gelster - Examination by Mr. Modica

1

2  A.  I do believe, yes.  They do take pictures in

3  medical.  So if I remember correctly there were

4  pictures taken.

5  Q.  Were you the person who took the photos?

6  A.  No.

7  Q.  But were you present when the photos were

8  taken?

9  A.  As the escort I probably would have been

10  present, yes.

11  Q.  All right.  So I want to show you a few

12  photos on the share screen.

13  All right.  I want to show you what was marked as

14  Deposition Exhibit D.  First of all, can I ask you, do

15  you recognize this photo?

16  A.  I don't have a photo up yet.

17  Q.  I'm going to get this right on the eighth

18  deposition.  Poor Erin has been very patient with me.

19  I apologize, Deputy.

20  So now you're able to see Exhibit D, correct?

21  A.  Yes.

22  Q.  So fair to say in the center of the photo is

23  inmate Dublino?

24  A.  Correct.

25  Q.  And is that you on the left side of the

1        F. Gelster - Examination by Mr. Modica

2   photo?

3       A.    It would appear to be, yes.

4       Q.    And who is on the right side of the photo?

5       A.    That is Deputy Giardina.

6       Q.    And do you know who took this photo?

7       A.    I do not recall.  I know more than likely it

8   would have been a sergeant.

9       Q.    And do you know whether inmate Dublino's

10  hands were handcuffed when this photo was taken?

11      A.    They were.

12      Q.    And, again, do you recall whether the

13  handcuffs had been changed at all from the time he was

14  subdued outside of the attorney conference room until

15  the time this photo was taken?

16      A.    That I do not recall.

17      Q.    There appears to be a timestamp on this photo

18  if I'm reading correctly 3/9, 11:37.  Do you see that?

19      A.    I do.

20      Q.    Do you have an understanding of whether that

21  is an accurate timestamp as to when this photo was

22  taken?

23      A.    Honestly, I do not.

24      Q.    I'm going to show you what we've marked as

25  Deposition Exhibit E.  Do you see that photograph?

COMPUTER REPORTING SERVICE
(585) 325-3170

30

1           F. Gelster - Examination by Mr. Modica

2       A.      I do.

3       Q.      And does it also appear to have you in the

4    photo toward the left?

5       A.      It would appear so, yes.

6       Q.      And does it also appear to have Deputy

7    Giardina on the right?

8       A.      It would.

9       Q.      In the middle appears to be a left sided

10   profile of inmate Dublino.  Is that fair?

11      A.      It would be, yes.

12      Q.      And it would appear to me at least that he's

13   making some type of face.

14       Do you recall whether he was complaining of pain or

15   any of the circumstances as to why he had that face on

16   when that photo was taken?

17      A.      I do not recall, no.

18      Q.      And at least as far as location, both of

19   these photos, do you know where those photos were

20   taken?

21      A.      That would be the infirmary.

22      Q.      I want to show you what we've marked as

23   Deposition Exhibit F.  Can you see that exhibit?

24      A.      I can.

25      Q.      And, again, does it show you on the left side

1          F. Gelster - Examination by Mr. Modica

2     of the picture?

3          A.     It would appear so, yes.

4          Q.     And Deputy Giardina on the right side of the

5     picture?

6          A.     Correct.

7          Q.     And inmate Dublino in the middle, correct?

8          A.     Correct.

9          Q.     And it appears to show the profile of the

10    right side of his face.  Any recollection about this

11    picture?

12         A.     As a point of reference, no, I do not.  I

13    remember there being pictures taken, but of what and

14    how many I don't remember.

15         Q.     What is the purpose of taking pictures in

16    circumstances like that?

17         A.     As far as I remember it's to document any

18    injuries or lack thereof.

19         Q.     Again, did you observe any injuries on inmate

20    Dublino from the time you responded to the call through

21    and including the time these pictures were taken?

22         A.     Not that I recall, no.

23         Q.     Do you recall if inmate Dublino complained of

24    any pain in any part of his body?

25         A.     I cannot recall any specific thing that he

32

1        F. Gelster - Examination by Mr. Modica

2   said, no.

3        Q.    I'm going to show you the last picture which

4   is what we've identified as Deposition Exhibit G.   Can

5   you tell me what this picture is if you know?

6        A.    That would appear to be inmate Dublino's

7   hand.

8        Q.    And in part we know that -- is there

9   something that helps you know that that is his hand?

10       What is this on his left wrist?

11       A.    His wristband, but I cannot make out what

12   that says.

13       Q.    I would represent to you it has inmate

14   Dublino's picture and his name on it, but I know it's

15   hard for you to see that.

16       Did he complain, again if you know, of any injuries

17   to his hands?

18       A.    To the best of my knowledge I do not recall.

19       Q.    And do you see what is on his right hand what

20   appears to be a darker spot maybe?

21       A.    I do see that, yes.

22       Q.    Any indication as to how that was sustained?

23       A.    I have no idea.

24       Q.    Same thing with his left hand.   There appears

25   to be a couple marks in the middle towards the palm

1          F. Gelster - Examination by Mr. Modica

2    over his middle finger and index finger.

3          Any indication as to how those injuries were

4    sustained?

5          A.     I have no idea.

6          Q.     Okay.  Now, after these photos were taken

7    what if anything did you do regarding inmate Dublino?

8          A.     I do not recall.

9          If anything he would have been -- whether I did it

10   or not, again I don't remember.  It was quite some time

11   ago.

12         He would have been escorted to more than likely an

13   isolation cell until the investigation was over or back

14   to his cell - I honestly cannot remember - after

15   medical.

16         Q.     Again, you don't recall after those photos

17   were taken whether you did anything relative to the

18   handcuffs, take them off?

19         A.     I don't remember.  They may have been removed

20   and replaced properly or more comfortable.  I don't

21   know.

22         After medical it's not uncommon to remove them or

23   remove them and replace them on.

24         Q.     In a situation where -- is it so that an

25   examination can be done or it just depends?

34

1          F. Gelster - Examination by Mr. Modica

2      A.     It would be.   And it would appear in that

3  picture that that happened as his hands were in front

4  of him uncuffed.

5      Q.     Do you recall whether he engaged in any

6  threatening behavior towards you once the cuffs were

7  taken off?

8      A.     That I do not recall.

9      Q.     Do you recall if there was a report you filed

10  about him using force against you?

11     A.     Not that I know of.

12          MR. MODICA:  If I could just take a minute or

13  two break and then we can finish up.

14          MS. MOLISANI:  Sure.

15          MR. MODICA:  Thanks.

16  (Recess taken.)

17          MR. MODICA:  I don't have anything else.   I

18  appreciate your cooperation.

19          THE WITNESS:  Okay.

20          MR. MODICA:  Erin, do you have anything?

21          MS. MOLISANI:  No, I don't, but thanks for

22  coming in early.   I appreciate it.

23          MR. MODICA:  Okay.   You're excused.   I

24  appreciate it.

25               *          *          *

35

1        F. Gelster - Examination by Mr. Modica

2            REPORTER CERTIFICATE

3

4    I, Shari L. Vitalone, do hereby certify that I did

5  report in stenotype machine shorthand the proceedings

6  held in the above-entitled matter;

7    Further, that the foregoing transcript is a true

8  and accurate transcription of my said stenographic

9  notes taken at the time and place hereinbefore set

10  forth.

11

12  Dated 7/6/2021

13  at Rochester, New York

14

15                     s/ Shari L. Vitalone

16                  _____

17                     Shari L. Vitalone

18

19

20

21

22

23

24

25

36

1          F. Gelster - Examination by Mr. Modica

2                    WITNESS CERTIFICATE

3
                                              ORIGINAL
4    STATE OF              )

5    COUNTY OF             )

6

7        I, Frank Gelster, do hereby certify that I have

8    read the transcript of my testimony as taken under oath

9    on Wednesday, June 9, 2021, and that said transcript is

10   a true, complete and correct record of what was asked,

11   answered and said during said deposition, and that the

12   answers on record therein, and as may be modified in

13   conformity with the attached errata sheet, are true and

14   correct.

15

16

17

18                              _____

19

20

21   Subscribed and sworn to before me

22   this _____ day of _____, 2021

23   Notary Public

24

25

37

1          F. Gelster - Examination by Mr. Modica

2    In the Matter of:

     MARK T. DUBLINO                    **ORIGINAL**

3          Plaintiff

           -vs-

4    SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

     DEPUTY BRIAN THOMPSON, DEPUTY FRANK

5    GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

     DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

6          Defendants

           Civil Action No. 6:19-cv-6269-DGL

7

8    Errata sheet for the deposition of Frank Gelster taken

9    on Wednesday, June 9, 2021

10   PAGE        LINE        REASON FOR CHANGE

11   _____       _____       _____

12   _____       _____       _____

13   _____       _____       _____

14   _____       _____       _____

15   _____       _____       _____

16   _____       _____       _____

17   _____       _____       _____

18   _____       _____       _____

19   _____       _____       _____

20   _____       _____       _____

21   _____       _____       _____

22   _____       _____       _____

23   _____       _____       _____

24   _____       _____       _____

25   _____       _____       _____