# EXHIBIT G

1

2  UNITED STATES DISTRICT COURT                ORIGINAL

3  WESTERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - - - - - x

   MARK T. DUBLINO

5       Plaintiff

        -vs-

6  SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

   DEPUTY BRIAN THOMPSON, DEPUTY FRANK

7  GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

   DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

8       Defendants

   - - - - - - - - - - - - - - - - - - - - - - - X

9         Civil Action No. 6:19-cv-6269-DGL

10

11

12

13       Deposition of SHAWN WILSON taken pursuant to

14  notice via videoconference on Thursday, July 8, 2021

15  commencing at 8:48 a.m.

16

17

18

19

20

21  Reported by:

22  COMPUTER REPORTING SERVICE

23  John M. DiMartino, CSR, RPR

24  16 East Main Street, Suite 7

25  Rochester, New York  14614        (585) 325-3170

2

2    APPEARANCES:

3         MODICA LAW FIRM

4         By:   STEVEN V. MODICA, Esq.

5         2430 Ridgeway Avenue

6         Rochester, New York  14626

7         Attorneys for plaintiff.

8

9


10        ERIE COUNTY DEPARTMENT OF LAW

11        By:   ERIN MOLISANI, Esq.

12        95 Franklin Street, Suite 1634

13        Buffalo, New York  14202

14        Attorneys for defendants.

15

16

17

18

19

20

21

22

23

24

25

3

2                        INDEX

3    Shawn Wilson

4        Examination by Mr. Modica              4 - 30

5

6

7    Reporter Certificate                        31

8    Witness Certificate                         32

9    Errata Sheet                                33

10

11

12    (No exhibits marked.)

13

14

15

16

17

18

19

20

21

22

23

24

25

4

| 1 | S. Wilson - Examination by Mr. Modica |

1          S. Wilson - Examination by Mr. Modica

2                    SHAWN WILSON

3     called herein as a witness, being duly sworn,

4               testified as follows:

5   EXAMINATION BY MR. MODICA:

6     Q.    Good morning, Deputy Wilson.  Again, my name

7   is Steve Modica.  It's nice to meet you.

8     A.    Nice to meet you as well.

9     Q.    So I am pro bono counsel for Mark Thomas

10  Dublino.  As you know, he has brought an action against

11  you and seven of your colleagues.

12     I'm going to ask you a series of questions about

13  the incident at issue and I'd ask you to answer those

14  to the best of your ability.

15     A.    All right.

16     Q.    This process is a little more difficult on

17  Zoom.  So I ask that you be patient and let me finish

18  my question and I promise I'll be patient while you

19  finish your answer.  It makes Mr. DiMartino's job a lot

20  easier.

21     Okay?

22     A.    Yes, sir.

23     Q.    Thanks.  So are you currently employed by the

24  Erie County Sheriff's Department?

25     A.    Yes, sir.

5

1          S. Wilson - Examination by Mr. Modica

2     Q.     And you're in the Jail Management Division,

3  correct?

4     A.     Correct.

5     Q.     And how long have you worked for them?

6     A.     Going on thirteen and a half years now.

7     Q.     And during 2018 were you also working for

8  them?

9     A.     Yes, sir.

10    Q.     And were you working at the Erie County

11 Holding Center?

12    A.     Yes, sir.

13    Q.     And were you working the morning of March 9th

14 of 2018 at the Erie County Holding Center?

15    A.     Yes, sir.

16    Q.     And what was your job assignment that day?

17    A.     I was a bravo medical escort.

18    Q.     Can you tell me what responsibilities -- what

19 are your duties in that job?

20    A.     My duties in that job are basically any new

21 inmates we receive from any courts, we basically get

22 those guys checked in, get them to see medical.

23    Any escorts on the bravo level I'll take the

24 inmates -- escort them any where.

25    Thirdly I'm a third response basically so -- a

6

1          S. Wilson - Examination by Mr. Modica

2    secondary response I would say.

3        Q.    And when you use the term "bravo level," can

4    you explain that to me?

5        A.    Yes.  Bravo level is located within the jail.

6    It contains linear as well as podular units there, and

7    in there basically what I do -- there is a medical room

8    also in there as well.

9        So when we have inmates come up, we actually have

10   to sit them in a room and they have to see our medical

11   staff before they can be sent any where else in the

12   jail.

13       Q.    Terrific.  Now, do you recall, did you

14   interact with inmate Mark Thomas Dublino before March

15   9th of 2018?

16       A.    No, sir, not that I recall.

17       Q.    And certainly you interacted with him on

18   March 9th of 2018; is that correct?

19       A.    Correct.

20       Q.    Now, there's a video of at least part of your

21   interaction with Mr. Dublino.  Is that a video that

22   you've seen before?

23       A.    I have not, no, sir.

24       Q.    So I have it here and it's been marked as

25   Deposition Exhibit A and I'm going to show that to you.

7

1              S. Wilson - Examination by Mr. Modica

2    It's only about three minutes long, but I'm going to

3    take you through it.

4        If at any point you want me to pause or stop let me

5    know.  I'll ask you a series of questions, but don't

6    hesitate.  I think you'll find it pretty easy.

7        At this point if I could share the screen, I should

8    be able to do this.

9        Deputy Wilson, can you see the video screen?

10       A.    Yes, sir.

11       Q.    Okay.  And just for purposes of the record,

12   it depicts four different views.  The one on the upper

13   left is labeled Alpha Hallway.

14       Do you see that right here?

15       A.    Yes, sir.

16       Q.    And the one on the lower left depicts or is

17   labeled Attorney Visit Sally Port.  Do you see that?

18       A.    Yes, sir.

19       Q.    And on the upper right there is a label of

20   Attorney Visit A.  Do you see that?

21       A.    Yes, sir.

22       Q.    And then below it on the bottom right you see

23   it's also labeled Attorney Visit B.

24       Is that all correct?

25       A.    Yes, sir.

8

```
 1              S. Wilson - Examination by Mr. Modica
 2        Q.    I'll represent to you this is video from
 3   March 9th of 2018, and but if you look at any of the
 4   four boxes at the bottom you'll see a time, a date and
 5   time stamp in case you're wondering.
 6        Okay?
 7        A.    Okay.
 8        Q.    All right.  Terrific.  What I'd like to do is
 9   I'll start playing the video.  If you could tell me to
10   stop when you first come into vision I would be
11   grateful for that.
12        A.    Okay.  Stop.
13        Q.    Okay.  So, Deputy, you asked me to stop.  Let
14   me first ask you which window so to speak of the four
15   are you looking at?
16        A.    I'm looking at frame Alpha Hallway 301.
17        Q.    And just for purposes of the record I paused
18   it where the date and time stamp is 3/9/2018 at 10:22
19   and 44.135 in the a.m.; is that correct?
20        A.    Correct.
21        Q.    And would you describe for me, Deputy Wilson,
22   where do you see yourself?
23        A.    On the bottom left-hand corner with white
24   gloves on.
25        Q.    Okay.  So right here we're looking at this
```

9

1           S. Wilson - Examination by Mr. Modica

2    paused screen and you would be the person closest to

3    the front of the screen so to speak furthest left; is

4    that correct?

5        A.    Correct, yes.

6        Q.    And do you recall how it is that you got in

7    this position at all?

8        A.    I do not, unfortunately.  I'm sorry.

9        Q.    We'll come back and I'll talk to you a little

10   bit later about the 10-99 calls, but I'll take you

11   through the video.

12       So I'm going to continue.

13   (Deposition Exhibit A played.)

14       Q.    All right.  I've stopped the video.  I want

15   to direct your attention to the box on the top right

16   labeled Attorney Visit A.

17       I've stopped it at 3/9/2018 at 10:22 and 50.051

18   seconds in the a.m.

19       Does that depict you, Deputy Wilson, I would say

20   the left side of the screen, the second person?

21       A.    Yes, sir.

22       Q.    Okay.  And at that point do you recall where

23   you headed?

24       A.    I was headed to -- it looks like to -- in the

25   hallway to -- we were going to cuff inmate Dublino and

1          S. Wilson - Examination by Mr. Modica

2    he was on the ground.

3         I think if I'm not mistaken Officer Thompson was

4    struggling with him maybe.

5         Q.    Okay.   I'm going to continue with the tape.

6         A.    Okay.

7    (Deposition Exhibit A played.)

8         Q.    So I've stopped it again.   Let's look at

9    Attorney Visit A.   I've stopped it at 10:22 and 52.954

10   seconds in the a.m.

11        At that point is it correct that your body went

12   from a place we could see you to a place we could not

13   see you?

14        A.    Yes.

15        Q.    And can you tell me if you recall what were

16   you doing at that time that caused you to be out of the

17   view of the camera?

18        A.    I think I was attempting to secure inmate

19   Dublino's hands so we can cuff him.

20        Q.    And at that point if you recall where was

21   inmate Dublino at that time?

22        A.    He was laying on the ground as Officer

23   Thompson was struggling with him.

24        He was not cooperating - I do know that - and so

25   Officer Thompson was trying to hold him down, but he

11

1          S. Wilson - Examination by Mr. Modica

2    was trying to get up from what I recall.

3          Q.    And as far as this camera is concerned, is

4    this camera if you know fixed or does it move in any

5    way?

6          A.    Unfortunately, I do not have the answer to

7    that.  I'm not sure.

8          Q.    Certainly.  All right.  I'm going to continue

9    with the video.

10         A.    Okay.

11   (Deposition Exhibit A played.)

12         Q.    Okay.  Deputy Wilson, I'd like to direct your

13   attention to the box at the lower right Attorney Visit

14   B.

15         A.    Okay.

16         Q.    I paused it at 10:23 and 42.321 seconds in

17   the a.m. and I'm circling what I believe is you which

18   would be toward the right-hand side, middle right of

19   the photo, a person who appears to be kneeling or

20   certainly below standing level.

21         Is that accurate?

22         A.    Yes.

23         Q.    And again, if you recall what were you doing

24   at that point?

25         A.    Still trying to get inmate Dublino's hands so

1          S. Wilson - Examination by Mr. Modica

2     we can get him -- to get him cuffed because he was

3     still resisting.

4          Q.    I'm going to start the video again.

5     (Deposition Exhibit A played.)

6          Q.    I've paused the video again.  I'm going to

7     focus on the Attorney Visit B box and pause it at 10:24

8     and 3.242 seconds in the a.m.

9          It appears that inmate Dublino is now standing.  Is

10    that fair?

11         A.    Yes.

12         Q.    And can you identify this gentleman who is to

13    our left and to inmate Dublino's right?

14         A.    It looks like Deputy Gelster.

15         Q.    I'll represent to you that I believe that

16    that's Deputy Gelster as well, but it's not important

17    what I believe.  It's important what you believe.

18         Is it fair to say that behind who we believe is

19    Deputy Gelster is you standing there?

20         A.    Yes, sir.

21         Q.    And it looks like about half your face is

22    obscured by Deputy Gelster's head; is that correct?

23         A.    Yes, sir.

24         Q.    And at that point are you having any physical

25    contact with inmate Dublino by that point?

13

1          S. Wilson - Examination by Mr. Modica

2     A.    No, sir.

3     Q.    I'll start the tape again.

4   (Deposition Exhibit A played.)

5     Q.    I've paused it again.  If you could focus on

6   Attorney Visit B box, I paused it at 10:24 and 14.253

7   seconds in the a.m.

8     Is that you kind of the third person of a group of

9   four?

10    A.    Yes, sir.

11    Q.    And it looks like you're looking into a room.

12  Can you tell me what room that is?

13    A.    That is Attorney Room 3 if I'm not mistaken.

14    Q.    All right.  And any recollection as you sit

15  here today as to what you were looking at or what you

16  saw?

17    A.    The lawyer -- actually Dublino's lawyer I

18  think Mr. Terranova - I think I was looking at him and

19  his injuries.

20    Q.    I'll start the tape again.

21  (Deposition Exhibit A played.)

22    Q.    Okay.  I've paused the tape again.  Again I'd

23  like you to focus on the box entitled Attorney Visit B.

24  I paused it at 10:24 and 41.080 seconds in the a.m.

25    It appears that someone is emerging from that room

14

1          S. Wilson - Examination by Mr. Modica

2     that you described.  Do you know who that is?

3          A.     That would be his attorney - Mr. Dublino's

4     attorney, Mr. Terranova - if I'm not mistaken.

5          Q.     That's you to Mr. Terranova's immediate left,

6     correct?

7          A.     Yes, sir.

8          Q.     Can you identify the two other members of law

9     enforcement that are there?

10          A.     That would be Sergeant Robert Dee and Deputy

11     Joe Dispenza.

12          Q.     And would Sergeant Dee be next to you --

13     closest next to you in the middle of the picture so to

14     speak?

15          A.     Yes, sir.  Yes, to my left.

16          Q.     And then this would be the other gentleman?

17          A.     Correct, yes.

18          Q.     Okay.  Thank you.  I'll start the tape again.

19     (Deposition Exhibit A played.)

20          Q.     I've paused it again.  I'll ask you to focus

21     on the part of the box that's labeled Attorney Visit

22     Sally Port.

23          A.     Okay.

24          Q.     I paused it at 10:25 and 09.881 seconds in

25     the a.m.

15

1          S. Wilson - Examination by Mr. Modica

2      Is that you depicted kind of the more right side of

3   the photo closest to the person looking at it?

4      A.    Yes.

5      Q.    And at that point you've passed from the

6   corridor in the attorney visit room into the attorney

7   visit sallyport.

8      Do you recall what you were doing at that time?

9      A.    Probably just getting ready to head -- figure

10  out where I was heading back to to see if they needed

11  me to do anything else.

12     Q.    We saw earlier there were folks escorting

13  Attorney Terranova.  Do you know where they were taking

14  him?

15     A.    I would say to medical, but I don't think

16  they did.  They -- they may have taken him to central

17  control.

18     To be honest, I'm not a hundred percent sure what

19  they did with him.

20     Q.    Understood.  Okay.  I'm going to start the

21  tape again.

22  (Deposition Exhibit A played.)

23     Q.    I'll pause it.  It appears you continued

24  through the attorney sally port down the alpha hallway

25  and then you're out of sight; is that fair?

16

S. Wilson - Examination by Mr. Modica

1

2     A.    I'm actually still -- if you look at the

3     left-hand side I'm still by the elevator right there.

4     Q.    Is that you right there?

5     A.    Yes, sir.

6     Q.    All right.  So for purposes of the record I'm

7     looking at the Alpha Hallway box paused at 10:25 and

8     25.401 seconds in the a.m. and the witness has

9     indicated that he is located facing the camera so to

10    speak on the left side near the elevator.

11        I'll start it again.

12    (Deposition Exhibit A played.)

13    Q.    And then that ends the video; is that

14    correct?

15    A.    Yes, sir.

16    Q.    Okay.  Now, having seen the video is there

17    anything about it that you think is incorrect or

18    incomplete?

19    A.    No.

20    Q.    Now, did you prepare a memorandum about this

21    incident?

22    A.    You know, I don't -- to be honest, I don't

23    remember.  I'm sure I must have written something -

24    probably a use of force maybe.

25    Q.    Sure.  Okay.  I'm going to show you what we

```
 1            S. Wilson - Examination by Mr. Modica
 2    have marked as Deposition Exhibit J.  I know it's a
 3    little bit large on my screen.  Are you able to see it?
 4        A.    Yes, sir.
 5        Q.    So do you recognize this document?
 6        A.    Yes.  So I was working elevator escort not
 7    bravo medical.
 8        Q.    First of all, just generally tell me what is
 9    this exhibit?
10        A.    This is our memorandum.  It's essentially
11    basically what we call a pink sheet.
12        Any time an incident happens we're involved in we
13    have to write a pink sheet basically - basically a
14    memorandum stating what transpired during that
15    incident.
16        Q.    And do you recall when you prepared this?
17        A.    It would have been the same exact date.
18        Q.    And again, that date being March 9th of 2018?
19        A.    March 9th, yes, sir.  I'm sorry.
20        Q.    That's okay.  And as indicated it's a memo
21    from you and it's to sergeant -- could you pronounce
22    his last name?
23        A.    Smaczniak.
24        Q.    Is that your immediate superior or --
25        A.    On that day he was, yes.
```

18

1        S. Wilson - Examination by Mr. Modica

2    Q.    The first sentence, "On the above date and

3    time at approximately 10:20 hours while working as

4    elevator escort 1 I did hear a 10-99 call on the radio

5    for Attorney Room 3 and responded to this call."

6    Did I read that correctly?

7    A.    Yes.

8    Q.    And to clarify, now you recall that day you

9    were working as an elevator escort, correct?

10   A.    Yes, sir, yes.

11   Q.    What were your responsibilities as an

12   elevator escort on that day?

13   A.    Elevator escort, essentially we do -- inmates

14   that travel throughout the building, we have to ride

15   the elevator where ever they need to go.

16   Also my secondary job is respond to any what we

17   call 10 codes, any inmate disturbances, fires, 10-99s.

18   Any 10 code essentially I would be a response team to.

19   Q.    And what is, Deputy Wilson, a 10-99?

20   A.    10-99 is officer in trouble.

21   Q.    And what is your understanding of your

22   responsibility if there's a 10-99 call?

23   A.    10-99, any available officer in the building

24   who is assigned to any escort position, ground floor

25   position, any available -- any one who is not working a

1              S. Wilson - Examination by Mr. Modica
2   unit - essentially is not essentially with an inmate -
3   are to respond to any 10-99s.
4        Q.    You mentioned 10-99 is typically a code for
5   an officer in trouble.
6        Is there a code if you know for an altercation
7   between an inmate and his lawyer?
8        A.    I do not know, unfortunately.  It's been my
9   first experience with it.  So we -- so no.
10       Q.    Was that actually your first 10-99 call in
11  your career to that point?
12       A.    Yes.
13       Q.    And when you say you got the call on the
14  radio, can you tell me was it your personal radio, was
15  it a facility radio or both?
16       A.    Facility radio.
17       So each -- we each carry a radio for each position
18  you have in the facility.  Any one has a radio for
19  where ever you work.  That was my elevator escort
20  radio.
21       Q.    And do you recall where you were at the time
22  you got that 10-99 call?
23       A.    I would have been on bravo.
24       Q.    And again, bravo is a medical unit?
25       A.    Yes, medical unit, yes.

20

1          S. Wilson - Examination by Mr. Modica

2      Q.    And if you remember what did the 10-99 direct

3  you to do or go?

4      A.    To -- it directed me to Attorney Visit Room

5  3.

6      Q.    Did you go directly there --

7      A.    Yes.

8      Q.    -- once you got the call?

9      A.    Yes, sir.

10     Q.    Now, the next sentence of the report

11 Deposition Exhibit J reads, "Upon arrival I did observe

12 inmate Dublino Mark" - and it list his ICN - "on the

13 ground being given verbal commands by Deputy Thompson

14 to place his hands behind his back."

15     Did I read that correctly?

16     A.    Yes.

17     Q.    And when you saw inmate Dublino on the

18 ground, was he face up, face down, on the side or some

19 other position?

20     A.    He was laying -- he was laying down -- he was

21 on the ground.

22     Thompson pretty much was trying to grab his arms to

23 pull his arms behind his back and giving him verbal

24 commands at the same time.

25     Q.    So just to clarify, was inmate Dublino face

21

1          S. Wilson - Examination by Mr. Modica

2     down on the ground?

3          A.     Yes.

4          Q.     Okay.  And do you recall whether inmate

5     Dublino complied with the verbal commands of Deputy

6     Thompson at that time?

7          A.     He did not.

8          Q.     What do you recall about that?

9          A.      I recall him just not -- I remember Deputy

10     Thompson saying, "Put your arms behind your back.  Put

11     your arms behind your back."

12          His arms were almost flailing.  I guess just

13     resisting -- I guess the best way to put it is

14     resisting.

15          He would not put his arms behind his back.

16          Q.     And Deputy Thompson, tell me, he is in part a

17     K-9 officer, correct?

18          A.     Correct, yes.

19          Q.     Do you recall whether he had the K-9 with him

20     at the time of the interaction with inmate Dublino?

21          A.     That I do not remember to be honest.

22          Q.     All right.  Going back to the report - the

23     memo I should say, Deposition Exhibit J - the next

24     sentence reads, "Deputy Gelster and I then took control

25     of inmate Dublino's right arm."

                    S. Wilson - Examination by Mr. Modica

1

2       Did I read that correctly?

3       A.    Yes, sir.

4       Q.    And could you describe for me how you and

5   Deputy Gelster did that?

6       A.    I essentially grabbed the lower forearm and

7   Gelster -- Deputy Gelster grabbed the upper arm -- his

8   upper arm on the right side as I recall.

9       Q.    And for what purpose were you touching inmate

10  Dublino?

11      A.    So that we could restrain him and put him in

12  handcuffs.

13      Q.    And what did you understand happened prior to

14  that that would warrant inmate Dublino being put in

15  handcuffs?

16      A.    I was not -- to be honest, I was not sure.

17      It was a 10-99.  So it was an officer in trouble

18  call.

19      So what I -- I got there and I saw Deputy Thompson

20  and I thought it was him who was in trouble.

21      Q.    All right.  I'll read the next sentence -

22  again, it's Exhibit J - "While I continued to control

23  inmate Dublino's right arm, Deputy Gelster did place a

24  mechanical restraint upon his right wrist."

25      Did I read that correctly?

23

```
 1              S. Wilson - Examination by Mr. Modica
 2       A.      Yes.
 3       Q.      And that's your recollection -- when you say
 4   "mechanical restraint," do you mean handcuffs?
 5       A.      Yes, sir.
 6       Q.      And then the last sentence of that -- the
 7   second last sentence of that memo reads, "Deputy
 8   Gelster then placed a mechanical restraint upon inmate
 9   Dublino's left wrist which was secured by Sergeant
10   Dee."
11       Did I read that correctly?
12       A.      Yes, sir.
13       Q.      And again, that mechanical restraint being
14   handcuffs?
15       A.      Yes.
16       Q.      Then it says "End of report."  Did I read
17   that correctly?
18       A.      Yes, sir.
19       Q.      Do you recall how inmate Dublino was
20   handcuffed?
21       What I mean is, were his arms in front of his body
22   or behind his body?
23       A.      Behind.
24       Q.      And with respect to his hands behind his
25   body, were the palms of his hands facing away from the
```

COMPUTER REPORTING SERVICE
(585) 325-3170

24

1        S. Wilson - Examination by Mr. Modica

2    center of his body or toward the center of his body?

3        A.    I do not recall, to be honest with you.

4        Q.    Is there kind of a standard way so to speak

5    that someone is supposed to be handcuffed?

6        A.    Yes.

7        If the inmate -- typically we -- well, when we

8    handcuff an inmate we would put the palms facing

9    outwards thumbs up in a typical -- in a regular

10   situation.

11       If an inmate is restraining we have to do it the

12   best we can.  There's really no way to follow the

13   protocol if they're resisting.

14       Q.    So just to clarify, ordinarily without any

15   complication the inmate's hands would be handcuffed

16   behind their back with their palms facing away from the

17   center of their body thumbs up?

18       A.    Correct.

19       Q.    But there may be other circumstances when

20   doing it that way is not possible and so you may have

21   to cuff them some other way?

22       A.    Yes, sir.

23       Q.    Is that fair?

24       A.    Yes, sir.

25       Q.    From the time that you arrived -- before I do

25

1           S. Wilson - Examination by Mr. Modica

2      that, I want to show you what we've marked as

3      Deposition Exhibit K.

4           Can you see that document on your screen?

5           A.    Yes, sir.

6           Q.    Can you just tell us what that is?

7           A.    That would be a use of force report.

8           Q.    And is that something that's also required in

9      addition to the pink sheet memo that you described a

10     few minutes ago?

11          A.    Yes, sir.

12          Q.    And again, do you recall approximately when

13     you prepared this document?

14          A.    That would have been the same day, so

15     March -- was it March 9th - I'm sorry - 2018.

16          Q.    Now, from the time that you -- so from the

17     time you arrived after the 10-99 call and saw inmate

18     Dublino until the time he left your presence did he say

19     anything that you could hear?

20          A.    I do not recall honestly.

21          Q.    Okay.  Best of your recollection, was there

22     anything that you said to him or anybody else at that

23     point?

24          A.    No.

25          Q.    You said you thought that inmate Dublino had

1          S. Wilson - Examination by Mr. Modica
2     resisted Deputy Thompson.  Do you believe -- or did he
3     resist you at any point?
4          A.     Yes, because he wouldn't put his arms behind
5     his back.  He was struggling with us, yes.
6          Q.     So from the time that you arrived until the
7     time that inmate Dublino was subdued, did you hear Mr.
8     Terranova say anything?
9          A.     No, no, sir.
10         Q.     Now, there are a number of other people that
11    were part of the response team after the 10-99 call.
12    So I'm going to ask you about them and what you know if
13    anything about their actions if at all.
14         We talked about Deputy Thompson.  What -- when you
15    first arrived what did you see Deputy Thompson doing?
16         A.     He was -- like I say, he was on the ground
17    trying to secure inmate Dublino.
18         As far as exactly his -- you know, his placement,
19    I -- to be honest I can't remember exactly how he was.
20         Q.     Okay.  And again, your recollection was that
21    when you first saw inmate Dublino he was face down on
22    the ground, correct?
23         A.     Yes.
24         Q.     And do you recall where Deputy Thompson had
25    his hands at that point when you first arrived?

1          S. Wilson - Examination by Mr. Modica

2     A.     To be honest, I don't know.

3     Q.     I understand.  Let's talk about Sergeant

4  Justin Biegaj.  First of all, did I butcher his last

5  name or did I say it properly?

6     A.     You said it properly.  Very good.

7     Q.     Deputy Wilson, I've said it wrong about ten

8  times before this.  It goes to show you I'm able to

9  learn.

10     So inmate Dublino alleged that Sergeant Biegaj

11  stomped and stepped on him while he was on the ground

12  targeting his head and his back.

13     Did you see anything like that?

14     A.     No, sir, no.

15     Q.     He also alleged that Sergeant Biegaj put his

16  knee on inmate Dublino's back.  Did you see anything

17  like that?

18     A.     No, sir.

19     Q.     You mentioned earlier Sergeant Dee.  I want

20  to ask you a little bit about him.

21     My client alleged that he - Sergeant Dee - and you

22  grabbed his arms and his hands and bent and twisted

23  them in an abnormal position with extreme pressure.

24     What do you say to that allegation?

25     A.     That would be false, no.

28

1          S. Wilson - Examination by Mr. Modica

2      Q.     And again, I think you testified you're not

3  sure today whether he was cuffed the normal way or some

4  other way; is that fair?

5      A.     That's fair, yes.

6      Q.     Now, we can go back and watch it again if

7  you'd like, but I'll represent to you that the video

8  shows Dublino on the ground out of sight of the camera

9  for about a minute and twenty seconds.

10      Can you tell us in your experience about how long

11  it would take to cuff an inmate?

12      A.     To be honest, I couldn't give you a fair

13  guesstimate.

14      If the inmate is not compliant it -- there's no --

15  there's no time frame to be honest with you,

16  unfortunately, that I could give you.

17      Q.     If the inmate was compliant would you expect

18  it to take that amount of time, more or less?

19      A.     Absolutely, no.  It would have been very --

20  fairly quick.

21      Q.     And again, your best recollection is that he

22  was resisting Deputy Thompson and you?

23      A.     Yes.

24      Q.     Let's talk about Sergeant Matthew Cross.  My

25  client alleges that Sergeant Cross stood directly over

1            S. Wilson - Examination by Mr. Modica

2    him and began stomping on his legs, ankles and feet

3    while he was on the floor.

4        Did you see Sergeant Cross during this interaction?

5        A.    I don't remember seeing Sergeant Cross at

6    all - just in the video, but not when we were cuffing

7    him, no.

8        Q.    In any event, you don't recall him stomping

9    on or having physical contact with inmate Dublino?

10       A.    No, sir.

11       Q.    I want to ask you a little bit about Sergeant

12   Jack Robinson and Deputies Peter Giardina and Frank

13   Gelster.

14       So Dublino alleges that he was picked up off the

15   ground by his arm and shoulders and escorted to the

16   infirmary and that while on the way Sergeant Robinson

17   ordered Gelster and Giardina to wrench his arms.

18       First of all, the video did depict you at least

19   seen in part as inmate Dublino was leaving, but how far

20   did you get?

21       A.    I don't recall.  I didn't get far.

22       They pretty much pulled him out of the room.  I was

23   still there.  He was already gone by the time I came

24   out of the attorney visiting room.

25       Q.    And in any respect did you see Deputies

30

1          S. Wilson - Examination by Mr. Modica

2    Giardina and Gelster wrenching inmate Dublino's arms at

3    any point?

4        A.    No, sir.

5             MR. MODICA:  Okay.  That's all I have.  Thank

6    you for coming in.  I appreciate it.  I know you're

7    coming off a shift and I appreciate your patience.

8             THE WITNESS:  You're welcome.  Thank you.

9

10

11

12              *           *           *

13

14

15

16

17

18

19

20

21

22

23

24

25

1              S. Wilson - Examination by Mr. Modica

2                     REPORTER CERTIFICATE

3

4       I, John M. DiMartino, CSR, RPR, do hereby certify

5  that I did report in stenotype machine shorthand the

6  proceedings held in the above-entitled matter;

7       Further, that the foregoing transcript is a true

8  and accurate transcription of my said stenographic

9  notes taken at the time and place hereinbefore set

10 forth.

11

12 Dated 7/12/2021

13 At Rochester, New York

14

15                        s/John M. DiMartino, CSR, RPR

16              _____

17              John M. DiMartino, CSR, RPR

18

19

20

21

22

23

24

25

32

1          S. Wilson - Examination by Mr. Modica

2                    WITNESS CERTIFICATE

3                                        **ORIGINAL**

4    STATE OF              )

5    COUNTY OF             )

6

7       I, Shawn Wilson, do hereby certify that I have

8    read the transcript of my testimony as taken under oath

9    on Thursday, July 8, 2021, and that said transcript is

10   a true, complete and correct record of what was asked,

11   answered and said during said deposition, and that the

12   answers on record therein, and as may be modified in

13   conformity with the attached errata sheet, are true and

14   correct.

15

16

17

18                            _____

19

20

21   Subscribed and sworn to before me

22   this _____ day of _____, 2021

23   Notary Public

24

25

                                                                    33

1              S. Wilson - Examination by Mr. Modica
2     In the Matter of:
      MARK T. DUBLINO                    **ORIGINAL**
3          Plaintiff
           -vs-
4     SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,
      DEPUTY BRIAN THOMPSON, DEPUTY FRANK
5     GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,
      DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON
6          Defendants
              Civil Action No. 6:19-cv-6269-DGL
7
8     Errata sheet for the deposition of Shawn Wilson taken
9     on Thursday, July 8, 2021
10    PAGE         LINE          REASON FOR CHANGE
11    _____        _____         _____
12    _____        _____         _____
13    _____        _____         _____
14    _____        _____         _____
15    _____        _____         _____
16    _____        _____         _____
17    _____        _____         _____
18    _____        _____         _____
19    _____        _____         _____
20    _____        _____         _____
21    _____        _____         _____
22    _____        _____         _____
23    _____        _____         _____
24    _____        _____         _____
25

COMPUTER REPORTING SERVICE
(585) 325-3170