# EXHIBIT I

**ORIGINAL**

1

2  UNITED STATES DISTRICT COURT

3  WESTERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - - - - - x

MARK T. DUBLINO

5      Plaintiff

   -vs-

6  SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

DEPUTY BRIAN THOMPSON, DEPUTY FRANK

7  GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

8      Defendants

   - - - - - - - - - - - - - - - - - - - - - - - X

9          Civil Action No. 6:19-cv-6269-DGL

10

11

12

13      Deposition of MATTHEW L. CROSS taken pursuant to

14  notice via videoconference on Friday, July 9, 2021

15  commencing at 10:08 a.m.

16

17

18

19

20

21  Reported by:

22  COMPUTER REPORTING SERVICE

23  Shari L. Vitalone

24  16 East Main Street, Suite 7

25  Rochester, New York  14614          (585) 325-3170

2

2  APPEARANCES:

3       MODICA LAW FIRM

4       By:  STEVEN V. MODICA, Esq.

5       2430 Ridgeway Avenue

6       Rochester, New York  14626

7       Attorneys for plaintiff.

8

9


10       ERIE COUNTY DEPARTMENT OF LAW

11       By:  ERIN MOLISANI, Esq.

12       95 Franklin Street, Suite 1634

13       Buffalo, New York  14202

14       Attorneys for defendants.

15

16

17

18

19

20

21

22

23

24

25

3

2                          INDEX

3    Matthew L. Cross

4         Examination by Mr. Modica              4 - 25

5

6

7    Reporter Certificate                        26

8    Witness Certificate                         27

9    Errata Sheet                                28

10

11

12    (No exhibits marked.)

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          M. Cross - Examination by Mr. Modica

2                    MATTHEW L. CROSS

3      called herein as a witness, being duly sworn,

4                  testified as follows:

5   EXAMINATION BY MR. MODICA:

6      Q.     Good morning, Mr. Cross.  Nice to meet you.

7      Again, my name is Steve Modica.  I am the pro bono

8   counsel for Mark Thomas Dublino.

9      I'm going to ask you some questions.  Please answer

10  those questions to the best of your ability.

11     If you have any difficulty understanding them,

12  please let me know, but it should be relatively simple

13  and I hope you're able to answer them as well as you

14  can.

15     We're using the Zoom conferencing platform so it's

16  very important that you let me finish my question and I

17  let you finish your answer so we don't talk over each

18  other.

19     Is that acceptable?

20     A.     Yes.

21     Q.     Thank you.  Were you formerly an employee of

22  the Jail Management Division?

23     A.     Yes.

24     Q.     And how long did you work for them?

25     A.     Approximately twelve years.

5

1          M. Cross - Examination by Mr. Modica

2     Q.     And when did you stop working for them?

3     A.     January of 2019.

4     Q.     And at the time you stopped working for them

5  what was your rank?

6     A.     Sheriff - I'm sorry - sergeant.

7     Q.     Sergeant, okay.  And were you working for the

8  Jail Management Division of the Erie County Sheriff's

9  Office in 2018?

10    A.     Yes, I was.

11    Q.     And were you performing your work at that

12 time at the Erie County Holding Center?

13    A.     Yes.

14    Q.     And were you working at the Erie County

15 Holding Center on the morning of March 9th of 2018?

16    A.     Yes.

17    Q.     And what was your job assignment that day?

18    A.     I was a supervisor role.  I believe I was

19 working on the ground floor supervising deputies.

20    Q.     And did you have any interactions that you

21 can recall with Mark Dublino before March 9th of 2018?

22    A.     I recall handling some complaints that he had

23 been making on housing units throughout his stay.  I

24 don't remember exact dates.

25    Q.     Anything as you sit here now that stands out

1              M. Cross - Examination by Mr. Modica

2    about the nature of his complaints?

3         A.    I don't recall what they were.

4         Q.    You certainly interacted with him on March

5    9th of 2018; is that correct?

6         A.    Yes.

7         Q.    And are you aware that there's a video that

8    depicts at least part of your interaction with him on

9    that day?

10        A.    Yes.

11        Q.    Have you seen that video before?

12        A.    I have.

13        Q.    I've got that marked here as Deposition

14   Exhibit A and it's only about three minutes long.  So

15   I'm going to play it and give you the opportunity to

16   take a look at it.

17        I may ask you some questions about it and certainly

18   if there's any point in the video you want me to pause,

19   feel free to tell me to do that.

20        A.    Okay.

21        Q.    So just give me a moment.

22        Okay.  Mr. Cross, I'm showing you -- first of all,

23   can you see the screen and what's depicted on it?

24        A.    Yes.

25        Q.    And for purposes of the record is it fair to

```
 1            M. Cross - Examination by Mr. Modica
 2    say that it's divided into four boxes and that the
 3    upper left-hand box is labeled Alpha Hallway; is that
 4    correct?
 5        A.    Yes.
 6        Q.    The box below that on the left-hand side is
 7    labeled Attorney Visit Sallyport; is that correct?
 8        A.    That's correct.
 9        Q.    And on the top right-hand side of the screen
10    there's a box labeled Attorney Visit A; is that
11    correct?
12        A.    Yes.
13        Q.    And below it is a box labeled Attorney Visit
14    B; is that correct?
15        A.    That's correct.
16        Q.    Is it also accurate that each box has a
17    timestamp indicating the time on March 9th, 2018 that
18    the video shows?
19        A.    That's correct.
20        Q.    The best that you know is the video that
21    we're going to see complete?
22        A.    Complete?
23        Q.    Correct.
24        I mean, was it edited in any way or altered in any
25    way as far as you know?
```

1          M. Cross - Examination by Mr. Modica

2      A.    As far as I know it's complete.

3      Q.    All right.  So I'm going to start the video.

4  If you could please kindly let me know when you first

5  see yourself come into view and I will be sure to pause

6  it at that point.

7      So I'm going to start the video now.

8  (Deposition Exhibit A played.)

9      Q.    Okay.  I've paused the video at -- in the

10  alpha hallway box from, again, March 9th, 2018 at 10:22

11  and 44.936 seconds a.m.

12      Do you see yourself depicted at all in that box?

13      A.    Not yet.

14      Q.    All right.  I'll continue and please let me

15  know when you see yourself.

16  (Deposition Exhibit A played.)

17      A.    Right there.

18      Q.    Okay.  I've stopped the video.  Again, we're

19  in the alpha hallway box.  I paused it at 10:22 and

20  49.641 seconds a.m.

21      Can you tell me, sir, where you see yourself in

22  that picture?

23      A.    I see I'm in the lower box in the visit

24  sallyport holding the door open.

25      Q.    Okay.  So for the record, the witness is

1          M. Cross - Examination by Mr. Modica

2    referring to a different box, the Attorney Visit

3    Sallyport box, which was paused at 10:22 and 49.636

4    seconds a.m. and the witness indicates that it is him

5    shown in that still with his hand on the door.

6        Is that correct?

7        A.     That's correct.

8        Q.     I'm going to continue.

9    (Deposition Exhibit A played.)

10        Q.     I'm going to pause the video again.  I'd like

11    to direct your attention to the box labeled Attorney

12    Visit A and ask whether you see yourself in that still

13    which again is at 10:22 and 54.956 seconds a.m.?

14        A.     I'm standing next to the pillar in the

15    hallway below the fire detector.

16        Q.     And just for the record that would be the

17    left-hand most side of the photo and you're looking I

18    guess for lack of a better term toward the camera?

19        A.     Correct.

20        Q.     And tell me if you know what are you looking

21    at at that time?

22        A.     At this time I'm attempting to observe the

23    deputies that are actually, again, attempting to put

24    restraints on the defendant.

25        Q.     And by "defendant," you're referring to

1              M. Cross - Examination by Mr. Modica

2    Mr. Dublino?

3         A.     That's correct.

4         Q.     And let's back up for a minute.  How is it

5    that you originally came to come though the alpha

6    hallway through the sallyport and to the area where

7    we've stopped the video?

8         A.     I would have been responding to an activated

9    body alarm or a broadcast over the PA system in the

10   jail that there's an emergency in the attorney visit

11   area.

12        Q.     Is that commonly known as a 10-99 call?

13        A.     That's correct.

14        Q.     And what's your understanding of what a 10-99

15   call means?

16        A.     It means there's someone in trouble, someone

17   has been assaulted, someone has been attacked and

18   response is necessary.

19        Q.     And what was your responsibility if any as

20   someone in the building at the time you got a 10-99

21   call?

22        A.     It would have been part of the response team

23   to emergencies.

24        Q.     Do you recall where you were at the time you

25   got the 10-99 call?

M. Cross - Examination by Mr. Modica

A.    I do not recall.

Q.    And do you recall where the 10-99 call told you to respond?

A.    It would have been to the attorney visit area.

Q.    And this video depicts you headed toward that area; is that fair to say?

A.    Yes, sir.

Q.    All right.  I'm going to continue the video again focusing on kind of yourself.

(Deposition Exhibit A played.)

Q.    Okay.  I paused the video.

Again, I'd like to focus your attention on the box labeled Attorney Visit A at 10:23 and 12.974 seconds a.m.

Is that you on the left side of the still?

A.    Yes, it is.

Q.    And it appears that you're looking down.  Do you recall kind of what you were doing at that point?

A.    Yes.  I was looking down, again, attempting to observe restraints being placed on to Mr. Dublino.

Q.    When you first arrived in the hallway outside the attorney conference area was Mr. Dublino already on the ground at that point?

1          M. Cross - Examination by Mr. Modica

2     A.     Yes.

3     Q.     Do you recall whether he was face down, face

4  up or in some other way?

5     A.     I don't recall the exact positioning.   There

6  was many bodies in front of me.

7     Q.     Do you recall whether he was handcuffed by

8  the time that you got into the hallway?

9     A.     No, he was not.

10     Q.     All right.   I'm going to continue the video.

11  (Deposition Exhibit A played.)

12     Q.     I will pause it for a moment.

13     I didn't see where you went.   Are you -- do you

14  know where you are at the time I paused this video?

15     A.     I'll be honest.   I was kind of going back and

16  forth between boxes.   I don't know if you can back this

17  up at all.

18     Q.     I sure can.   Let me do that.

19     Let's back up.   Tell me when I should stop.

20  (Deposition Exhibit A played.)

21     A.     Right there.

22     Q.     So just for purposes of the record I backed

23  it up where the witness is depicted in the box Attorney

24  Visit A at 10:23 and 13.474 seconds a.m.

25     And, again, just for clarity you're on the

13

M. Cross - Examination by Mr. Modica

2  left-hand side of the box, correct?

3      A.    That's correct.

4      Q.    And you're looking down.  All right.

5      If you could simply trace your movement from

6  there -- I'll try to pause it a little quicker, but if

7  you could let me know what you do from there I'd

8  appreciate it.

9      A.    Okay.

10  (Deposition Exhibit A played.)

11     Q.    So did you see -- it looked like you stepped

12  outside of the view of the camera.  Do you recall what

13  you were doing at that point?

14     A.    Yes.  I would have been bending down to speak

15  to a deputy and making sure that restraints were

16  secured probably - just again doing supervisor duties.

17     Q.    Do you recall whether any of the folks in the

18  hallway had physical contact with inmate Dublino while

19  you were looking?

20     A.    Describe physical contact for me.

21     Q.    Was anybody touching him in any way?

22     A.    Yes.  He would have been under control by

23  deputies until we were ready to have him brought to his

24  feet.

25     Q.    Do you recall which deputies were attempting

14

1          M. Cross - Examination by Mr. Modica

2   to control him?

3       A.    I do not at this time.

4       Q.    And at least as of this moment where we've

5   paused the video did you have any physical contact with

6   inmate Dublino?

7       A.    No.

8       Q.    At any point did you have any physical

9   contact with inmate Dublino?

10      A.    Brief.  When he stood to his feet as we

11  continue the video I do recall just guiding him with my

12  hand as they were escorting him.  That was it.

13      Q.    Okay.  We'll continue the video and

14  certainly, again, tell me when to pause it so we can

15  see what you're doing.

16      A.    Okay.

17  (Deposition Exhibit A played.)

18      Q.    Okay.  I've paused the video.  I want to

19  focus your attention on the box labeled Attorney Visit

20  B.  I've paused it at 10:23 and 53.332 seconds a.m.

21      Do you see yourself in that still?

22      A.    I do.

23      Q.    Where do you see yourself?

24      A.    It would be off to the right-hand side

25  against the wall.

15

1          M. Cross - Examination by Mr. Modica

2      Q.     All right.  And that would be with your back

3  to the camera, correct?

4      A.     That's correct.

5      Q.     And there's another gentleman to your left

6  who also appears to be kind of clean shaven.  You're

7  the gentleman on the right who's clean shaven as well;

8  is that correct?

9      A.     That's correct.

10      Q.     Can you tell me who is that that is

11  immediately in front of you that's facing the camera

12  right here?

13      A.     That's Sergeant Justin Biegaj.

14      Q.     Right now we can't see inmate Dublino.  Can

15  you tell me where he is and what's happening at that

16  point?

17      A.     He's on the floor.  I'm not sure if he was --

18  it looked like to me he was restrained at that point

19  and they were getting ready to assist him to his feet.

20      Q.     All right.  And I'll continue the video.

21  (Deposition Exhibit A played.)

22      Q.     Okay.  So I've paused the video again

23  focusing on the box labeled Attorney Visit B.  I've

24  paused it at 10:24 and 01.440 seconds a.m.

25      Do you see yourself in the video?

16

1          M. Cross - Examination by Mr. Modica

2     A.     I do.

3     Q.     Can you tell us where you're located?

4     A.     I'm to the right of Mr. Dublino.

5     Q.     And that would be to the left of Sergeant

6  Biegaj?

7     A.     As he's facing the camera I'd be to his left.

8     Q.     All right.  And at this point can you tell me

9  if -- you know, there appears to be a deputy here who

10  has his hands on inmate Dublino.  Is that Deputy

11  Gelster?

12     A.     It is.

13     Q.     At any point as inmate Dublino was rising

14  from the floor did you have your hands on him?

15     A.     Rising from the floor, no.

16     Q.     Okay.  Or being assisted up like -- because I

17  couldn't tell from the video whether you were touching

18  him or not.

19     A.     Not while he was on his way up, no.

20     Q.     All right.  I'm going to continue the video.

21  (Deposition Exhibit A played.)

22     Q.     Okay.  I've paused the video again.  So is it

23  fair to say in general you are part of a group that was

24  headed from the attorney conference room area to --

25  through the attorney visit sallyport?

17

1          M. Cross - Examination by Mr. Modica

2      A.     That's correct.

3      Q.     Can you tell me if you recall what you were

4   doing on that path at that time?

5      A.     At this point we would be removing Mr.

6   Dublino from the scene and taking him to a more secure

7   location.

8      Q.     And were you going to take him to the

9   location or were others going to do that or both?

10     A.     I would have been part of the escort process.

11     Q.     All right.  I paused the attorney visit

12  sallyport box at 10:24 and 40.446 seconds a.m.

13     Do you see yourself in the box?

14     A.     I do.

15     Q.     And can you tell me where you see yourself?

16     A.     Right at the bottom.

17     Nope, that's not me.

18     Q.     This one is you?

19     A.     Yeah.

20     Q.     So for purposes of the record, just to be

21  clear I'll say that we see the back of your head in the

22  center of the box and that you are not the person to

23  the right of that person who's also clean shaven.

24     Fair enough?

25     A.     That's correct.

18

M. Cross - Examination by Mr. Modica

1

2    Q.    I'm going to resume the video.

3    (Deposition Exhibit A played.)

4    Q.    I've paused the video again.  Is it fair to

5    say it shows you going through the attorney visit

6    sallyport into the alpha hallway and toward what other

7    witnesses have identified as elevators; is that

8    correct?

9    A.    That's correct.

10   Q.    And, again, your recollection is that you

11   were part of the group of folks that would be

12   transporting inmate Dublino to the infirmary; is that

13   right?

14   A.    Yes.

15   Q.    And why would he be transferred to the

16   infirmary at that point?

17   A.    Any inmate that's involved in any altercation

18   is immediately evaluated by medical personnel after.

19   Q.    And there are multiple elevators on the alpha

20   hallway; is that right?

21   A.    That's fair.

22   Q.    Do you recall whether you went up in the

23   elevator also occupied by inmate Dublino or another

24   elevator?

25   A.    I honestly don't recall.

19

1          M. Cross - Examination by Mr. Modica

2     Q.    I'll continue the video.  Again, please let

3  me know if that let's you one way or another.

4  (Deposition Exhibit A played.)

5     Q.    For the record I'll let the tape continue,

6  but my recollection is once you get on the elevator we

7  don't see you on the video any more.

8     If that's not the case please let me know.

9     A.    That's correct.  I'm done.

10    Q.    Okay.  And the video is complete so -- okay.

11 Thanks for your patience as I did that.

12    Okay.  Describe for me how inmates are supposed to

13 be handcuffed.

14    A.    The ideal position for inmates to be

15 handcuffed is with the top of his hands placed

16 together, handcuff keys, the holes are to be up, double

17 locked and secured behind their back.

18    Q.    Okay.  And just so that I make sure I

19 understand, you're saying the inmate should be

20 handcuffed behind his back, and would his palms be

21 facing away from the center of his body or towards the

22 center of his body?

23    A.    The ideal position would be facing away when

24 permissible.

25    Q.    Do you recall observing how inmate Dublino

COMPUTER REPORTING SERVICE
(585) 325-3170

1        M. Cross - Examination by Mr. Modica

2  was cuffed after the events on March 9th of 2018?

3     A.    I don't recall at this time.

4     Q.    Do you recall whether inmate Dublino resisted

5  the efforts of any of your colleagues to handcuff him?

6     A.    I do recall he was resistant to that.

7     Q.    Can you tell me what you saw or what you

8  heard that makes you believe he was resistant?

9     A.    Verbal commands being ignored to relax, to

10  place his hands behind his back to rolling body

11  posture.

12     Q.    From the time you arrived to the outside of

13  the attorney conference room and when Mr. Dublino was

14  subdued did you hear Mr. Terranova say anything?

15     A.    I don't recall speaking directly to

16  Mr. Terranova, and from my standpoint I was in the

17  hallway with Mr. Dublino.  So I wouldn't have had

18  immediate contact with him.

19     Q.    Do you recall, again, from the time you

20  arrived until the time inmate Dublino was subdued

21  hearing him - meaning Mr. Dublino - say anything to you

22  or anybody else?

23     A.    Just a lot of vulgar language and nothing

24  specific that I recall outside of just being upset.

25     Q.    Do you recall whether you accompanied inmate

1          M. Cross - Examination by Mr. Modica
2    Dublino to the infirmary?
3          A.    I honestly don't recall, sir.  Just what was
4    on the tape is my recollection.
5          Q.    I can represent to you that there was some
6    photographs taken of inmate Dublino in the infirmary
7    after the altercation.
8          Were you present when those photographs were taken?
9          A.    I don't recall.
10         Q.    Would it help for you to look at them?  If
11   you looked at them would that help you know if you were
12   present or not?
13         A.    Not unless there was something that
14   identified myself in them.
15         Q.    I'll represent to you that they have been
16   identified, and basically in those photos what we see
17   are Deputies Gelster and Giardina and that there was
18   testimony that Sergeant Biegaj was the one who took the
19   photographs.
20         A.    Okay.
21         Q.    Does that information help you recall one way
22   or another whether you were present when the photos
23   were taken?
24         A.    No, sir.
25         Q.    At any point did you or anyone ask inmate

1          M. Cross - Examination by Mr. Modica

2    Dublino whether he was injured in the altercation?

3          A.    I don't recall any specific security staff in

4    my general direction doing that.

5          Q.    Did you observe inmate Dublino sustain any

6    injuries?

7          A.    Not to my recollection.

8          Q.    I'm going to ask you about some of the other

9    folks that responded to the 10-99 call; specifically,

10   about some allegations my client is making about their

11   behavior.

12         Let's start with Sergeant Biegaj.  My client

13   alleges that Sergeant Biegaj stomped and stepped on his

14   head and neck while he was on the ground outside the

15   view of the camera.

16         Did you see any interactions between Sergeant

17   Biegaj and inmate Dublino?

18         A.    No, sir.

19         Q.    Did you see any interactions like that, any

20   stomping, any contact like that?

21         A.    Absolutely not.

22         Q.    Let's talk about Deputy Brian Thompson.

23         First of all, is it correct that he at that time

24   was a K-9 officer?

25         A.    Yes, sir.

23

1          M. Cross - Examination by Mr. Modica

2     Q.     Do you know whether the K-9 was present at

3     the time he interacted with inmate Dublino on March 9th

4     of 2018?

5     A.     Yes.

6     Q.     Did you actually see the dog?

7     A.     I did.

8     Q.     And is it correct the dog's name at that

9     time - probably still now - is Bili?

10    A.     That's correct.

11    Q.     Now, is Deputy Thompson holding Bili during

12    the encounter with Dublino?

13    A.     Yes.

14    Q.     How was he holding him?

15    A.     Initially by the leash and then I believe he

16    went to the collar for a more secure hold.

17    Q.     At any point did -- well, strike that.

18    How did Bili react during this altercation if you

19    know?

20    A.     I didn't see anything other than just a dog

21    being present.

22    Q.     Were you familiar with Bili's general

23    demeanor on or about March 9th of 2018?

24    A.     Yes, sir.

25    Q.     What can you tell me about his demeanor

24

1          M. Cross - Examination by Mr. Modica

2    generally?

3          A.     He was an extremely friendly, drug specific

4    searching dog.  I don't even believe he had any type of

5    bite training, but a very friendly dog.

6          Q.     My client alleges that Bili bit him.  Did you

7    see Bili have any physical contact with inmate Dublino?

8          A.     No, sir.

9          Q.     My client alleges Bili scratched him.  Did

10   you see Bili at any point scratching my client?

11         A.     No, sir.

12         Q.     At any point did you see Deputy Thompson lose

13   control over Bili?

14         A.     No, sir.

15         Q.     I want to ask you a little bit about Sergeant

16   Robinson and Deputy Wilson.

17         My client alleges that Deputy Wilson grabbed his

18   arms and hands and bent them and twisted them in

19   abnormal positions with extreme pressure.

20         Did you observe any contact by Sergeant Robinson or

21   Deputy Wilson of that nature?

22         A.     No, sir.

23         Q.     As you saw in the video, inmate Dublino was

24   escorted to the infirmary after the incident.  He

25   contends that Sergeant Robinson directed Deputies

25

1          M. Cross - Examination by Mr. Modica

2    Gelster and Giardina to wrench his hands and his arms

3    and that they did so with extreme pressure.

4        How far if you recall did you make it from the

5    alpha hallway to the infirmary with inmate Dublino?

6        A.    I don't recall.  I don't want to speculate,

7    sir.

8        Q.    In any event, is it fair to say you didn't

9    observe any behavior like that that might have been

10   outside the view of the camera?

11       A.    Yeah.  I didn't observe anything like that.

12           MR. MODICA:  All right.  I have nothing else.

13   I appreciate your time.

14           Thank you.

15           THE WITNESS:  Thank you.

16           MR. MODICA:  You're welcome.

17

18

19           *          *          *

20

21

22

23

24

25

26

1          M. Cross - Examination by Mr. Modica

2                    REPORTER CERTIFICATE

3

4      I, Shari L. Vitalone, do hereby certify that I did

5  report in stenotype machine shorthand the proceedings

6  held in the above-entitled matter;

7      Further, that the foregoing transcript is a true

8  and accurate transcription of my said stenographic

9  notes taken at the time and place hereinbefore set

10  forth.

11

12  Dated 7/23/2021

13  at Rochester, New York

14

15                              s/ Shari L. Vitalone

16                       _____

17                              Shari L. Vitalone

18

19

20

21

22

23

24

25

27

1        M. Cross - Examination by Mr. Modica

2              WITNESS CERTIFICATE                ORIGINAL

3

4    STATE OF                 )

5    COUNTY OF                )

6

7        I, Matthew L. Cross, do hereby certify that I have

8    read the transcript of my testimony as taken under oath

9    on Friday, July 9, 2021, and that said transcript is a

10   true, complete and correct record of what was asked,

11   answered and said during said deposition, and that the

12   answers on record therein, and as may be modified in

13   conformity with the attached errata sheet, are true and

14   correct.

15

16

17

18                                _____

19

20

21   Subscribed and sworn to before me

22   this _____ day of _____, 2021

23   Notary Public

24

25

**COMPUTER REPORTING SERVICE**
**(585) 325-3170**

28

1   M. Cross - Examination by Mr. Modica

2 In the Matter of:

MARK T. DUBLINO    *ORIGINAL*

3  Plaintiff

  -vs-

4 SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

DEPUTY BRIAN THOMPSON, DEPUTY FRANK

5 GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

6  Defendants

   Civil Action No. 6:19-cv-6269-DGL

7

8 Errata sheet for the deposition of Matthew L. Cross

9 taken on Friday, July 9, 2021

10 PAGE  LINE   REASON FOR CHANGE

11 _____  _____  _____

12 _____  _____  _____

13 _____  _____  _____

14 _____  _____  _____

15 _____  _____  _____

16 _____  _____  _____

17 _____  _____  _____

18 _____  _____  _____

19 _____  _____  _____

20 _____  _____  _____

21 _____  _____  _____

22 _____  _____  _____

23 _____  _____  _____

24 _____  _____  _____

25 _____  _____  _____