UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MARK T. DUBLINO,

*Plaintiff,*

v.

SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,
DEPUTY BRIAN THOMPSON,
DEPUTY FRANK GELSTER,
SGT. MR. CROSS, SGT. MR. ROBINSON,
DEPUTY MR. P. GIARDINA, and
DEPUTY SHAWN WILSON,

*Defendants.*

**MOVANTS' STATEMENT OF
MATERIAL FACTS**
Case No.: 19-CV-6269

---

Pursuant to Local Rule 56, defendants submit this Movants' Statement of Material Facts

pursuant to Local Rule 56 as to which defendants claim there are no genuine issue to be tried:

1.      In April 2021, plaintiff was convicted of assault in a correctional facility (Exhibit

A, p. 10, ll. 13-23, p. 11, ll. 1).

2.      The conviction arose out of an assault on Joe Terranova on March 9, 2018 (Exhibit

A, p. 11, ll. 15-18).

3.      Mr. Terranova was plaintiff's attorney at that time (Exhibit A, p. 16, ll. 7-16).

4.      The incident which is the subject of this lawsuit occurred on March 9, 2018 at 10:20

a.m. (Exhibit A, p. 13, ll. 6-10).

5.      As of March 9, 2018, plaintiff had been convicted of crimes for which Mr.

Terranova was his attorney (Exhibit A, p. 16, ll. 7-21).

6.      The incident occurred in and around attorney conference room 3 of the Erie County

Holding Center (Exhibit A, p. 13, ll. 11-15).

7.      Plaintiff testified that while in the attorney conference room, he pushed Mr. Terranova up against the wall and put his fingers into his eyes to defend himself from Mr. Terranova jabbing his pen at him (Exhibit A, p. 22, ll. 21-23; p. 23, ll. 1-7).

8.      A 10-99 call is an "officer needs assistance" call (Exhibit C, p. 14, ll. 12-13).

9.      Available deputies are to respond to the location of the 10-99 (Exhibit C, p. 14, ll. 14-17).

10.     On March 9, 2018, Deputy Thompson heard the 10-99 call over the PA system and radio (Exhibit C, p. 14, ll. 24-25; p. 15, ll. 2-4).

11.     Deputy Thompson had just let his K-9 dog, Billi, out and was nearby, so he and the dog responded (Exhibit C, p. 15, ll. 12-21).

12.     Deputy Thompson was the first to respond to the incident (Exhibit A, p. 23, ll. 19-23).

13.     When Deputy Thompson arrived at conference room three, he saw Mr. Terranova, who had visible injuries to his face. Mr. Terranova said that plaintiff had just assaulted him and he wanted to press charges (Exhibit C, p. 16, ll. 19-25).

14.     Mr. Terranova was in "pretty rough shape" and was bleeding from his face near his eyes (Exhibit H, p. 13, ll. 20-25; p. 14, ll. 2).

15.     Deputy Thompson ordered plaintiff to sit down, and then to lay face down on the ground, which plaintiff complied with (Exhibit C, p. 18, ll. 10-19).

16.     Deputy Thompson applied pressure to plaintiff's back until the response team arrived (Exhibit C, p. 18., ll. 20-23).

17.     Deputy Thompson used force on plaintiff because it appeared an assault on Mr. Terranova had occurred and he was trying to prevent something else from happening (Exhibit C, p. 21, ll. 11-18).

18.     Deputy Thompson held plaintiff down because he knew a response team was coming, and he had only one hand, as his other hand was holding the dog's leash (Exhibit C, p. 21, ll. 19-25; p. 22, ll. 2-4).

19.     Deputy Thompson does not carry handcuffs (Exhibit C, p. 20, ll. 2-3).

20.     When asked if defendant Thompson used force against him, plaintiff testified that defendant Thompson lost control of the dog and the dog bit his right hand (Exhibit A, p. 25, ll. 5-19).

21.     Plaintiff does not claim that the dog was not instructed to bite plaintiff (Exhibit A, p. 29, ll. 13-15).

22.     The dog is a narcotics-detection dog and is not trained to attack someone attacking his handler (Exhibit C, p. 22, ll. 9-17).

23.     Plaintiff stated that, "Where the excessive force is, is that Deputy Thompson had control of me down on the ground. He could have called off the dog, no pun intended, off the dogs that were running down on me, which was about six, six or seven deputies and he didn't do any of that." (Exhibit A, p. 30, ll. 3-8).

24.     When a 10-99 code (officer needs assistance) is called, a sergeant must radio central control to advise either of a false alarm or that the scene is cleared; a deputy cannot make that call (Exhibit C, p. 24, ll. 8-19; p. 14, ll.12-13).

25.     After the response team arrived, Deputy Thompson left the area within 20 to 30 seconds (Exhibit C, p. 25, ll. 6-12).

26.     Plaintiff testified that defendant Biegaj went down on his knee on plaintiff's back (Exhibit A, p. 31, ll. 2-10).

27.    Sergeant Biegaj went from a standing to a kneeling position to attempt to gain control of plaintiff's left hand, and in doing so, struck his right knee on the ground (Exhibit H, p. 10, ll. 4-14).

28.    Plaintiff was not complying with Sergeant Biegaj when instructed to place his hands behind his back (Exhibit H, p. 17, ll. 2-8).

29.    Sergeant Biegaj did not stomp or step on plaintiff (Exhibit H, p. 20, ll. 7-11; Exhibit I, p. 22, ll. 12-21).

30.    In the Amended Complaint, plaintiff alleges that Sergeant Dee and Deputy Wilson grabbed plaintiff's arms and hands and bent and twisted them in an abnormal position with extreme pressure (Dkt. No. 8, p. 4, para. 3).

31.    Upon questioning, plaintiff testified that Sergeant Dee and Deputy Wilson took longer than plaintiff thought it should to handcuff him (Exhibit A, p. 33, ll. 15-23; p. 34, ll. 1-2).

32.    There is no typical amount of time it takes to handcuff someone, especially in an emergency situation or if someone is resisting (Exhibit D, p. 20, ll. 18-25; Exhibit E, p. 34, ll. 10-16; Exhibit G, p. 28, ll. 10-16).

33.    Plaintiff was asked what Deputy Wilson and Sergeant Dee did to him and he stated, "The officers that were in the screen that were on top of me and then disappear, were Deputy Thompson, Deputy Biegaj, Sergeant Dee, Deputy Wilson, Sergeant Robinson and Deputy Scarpace, which should have been listed, but I didn't have his name at the time. Those people were -- there were six individuals on top of me." (Exhibit A, p. 38, ll. 22-23; p. 39, ll. 1-7).

34.    Plaintiff used a process of elimination by watching the video of this encounter to determine who must have been handcuffing him based on who was in the camera and then off the camera (Exhibit A, p. 39, ll. 8-23; p. 40, ll. 1).

35.     When asked about the bending his arms in abnormal positions, he testified that he was handcuffed with his palms facing outward, and then the handcuffs were removed and his hands turned inward toward his body (Exhibit A, p. 34, ll. 21-23; p. 35, ll. 1-23; p. 36, ll. 1-18).

36.     Defendant Gelster took control of plaintiff's right arm because plaintiff would not voluntarily put his hands behind his back (Exhibit D, p. 15, ll. 3-7).

37.     Deputy Gelster used force on plaintiff because he was not complying with orders (Exhibit D, p. 16, ll. 14-17).

38.     Plaintiff is "almost very, very certain" the person who instructed the handcuffs be removed and reapplied was Sergeant Robinson (Exhibit A, p. 37, ll. 12-18).

39.     Plaintiff does not know who removed the handcuffs and put them on the other way (Exhibit A, p. 37, ll. 23; p. 38, ll. 1-3).

40.     Plaintiff's handcuffs were not removed and reapplied the other way as he described (Exhibit D, p. 26, ll. 19-25; p. 26, ll. 2-3; Exhibit E, p. 39, ll. 4-7).

41.     In an emergency situation or when an inmate is resisting, an inmate may be handcuffed with his hands facing inward (rather than outward from the body) (Exhibit D, p. 16, ll. 5-10; Exhibit G, p. 24; ll. 4-13).

42.     Neither Sergeant Dee nor Deputy Wilson grabbed plaintiff's arms and hands and bent and twisted them in an abnormal position with extreme pressure (Exhibit H, p. 32, ll. 16-21).

43.     Plaintiff alleges defendant Cross was stomping on plaintiff's feet based on seeing him rocking back and forth in the video (Exhibit A, p. 40, ll. 2-15).

44.     Sergeant Cross did not stomp on plaintiff (Exhibit G, p. 29, ll. 8-10; Exhibit H, p. 33, ll. 2-4; Exhibit J, p. 22, ll. 19-25).

45.     Sergeant Cross' only physical contact with plaintiff was to guide him with his hand as plaintiff was being escorted (Exhibit I, p. 14, ll. 8-12).

46.     Plaintiff testified that he heard Sergeant Robinson say "wrench him" throughout the corridors and in the infirmary (Exhibit A, p. 43, ll. 10-23).

47.     Plaintiff claims that defendants Gelster and Giardina wrenched him (Exhibit A, p. 44, ll. 23-23; p. 45, ll. 1-18).

48.     Deputy Gelster did not recall anyone stomping, hitting, punching, or anything like that (Exhibit D, p. 25, ll. 22-25; p. 26, ll. 2).

49.     Sergeant Robinson did not touch plaintiff (Exhibit E, p. 26, ll. 10-11).

50.     Sergeant Robinson did not order anyone to "wrench" plaintiff (Exhibit D, p. 27, ll. 20-22; Exhibit E, p. 35, ll. 17-23; Exhibit F, p. 21, ll. 10-14; Exhibit H, p. 33, ll. 22-25; p. 34, ll. 2).

51.     Deputies Gelster and Giardina did not wrench plaintiff's arms (Exhibit H, p. 33, ll. 22-25; p. 34, ll. 2; Exhibit I, p. 25, ll. 8-11).

52.     Plaintiff was already handcuffed by the time Deputy Giardina responded to the scene (Exhibit F, p. 16, ll. 17-21).

53.     Plaintiff was resisting Deputy Wilson as he attempted to handcuff him (Exhibit G, p. 11, ll. 23-25; p. 12, ll. 2-3; p. 21, ll. 8-15; Exhibit I, p. 20, ll. 4-6).

54.     The dog did not have physical contact with plaintiff (Exhibit C, p. 23, ll. 8-16; Exhibit D, p. 24, ll. 23-25; p. 25, ll. 2-3; Exhibit E, p. 31, ll. 13-15; Exhibit F, p. 19, ll. 12-15; Exhibit H, p. 31, ll. 5-15; Exhibit I, p. 24, ll. 6-8; Exhibit J, p. 22, ll. 2-4).

55.     Plaintiff was escorted to medical after the incident because any inmate who is involved in any sort of altercation is evaluated by medical immediately after (Exhibit I, p. 18, ll. 10-18).

56.     Plaintiff was examined by RN Grace Moka on March 9, 2018 at 11:27 a.m., with non-specific complaints of pain, he was able to wiggle his fingers and raise his arms, and there

was no active bleeding noted (Dkt. No. 32-6, pp. 3-4).

57.     An assessment performed on March 9, 2018 at 7:52 p.m. showed plaintiff was complaining of pain to both hands (Dkt. No. 32-6, pp. 19-20).

58.     That assessment showed swelling and redness to his hands and no physical signs of injury to his back, sides, or chest. Plaintiff offered no other complaints (Dkt. No. 32-6, pp. 19-20).

59.     He refused medical care the day after the incident (Dkt. No. 32-6, p. 25).

60.     An assessment performed on March 12, 2018 showed no signs of injury to his right lower back or ribs. His hands were free of deformity and moving freely without swelling (Dkt. No. 32-6, pp. 42-43).

61.     Although x-rays were ordered after the March 12, 2018 assessment, he refused them (Dkt. No. 32-6, p. 73).

62.     Plaintiff has been incarcerated at three different facilities since this incident and has never received medical care for his claimed injuries (Exhibit A, p. 48, ll. 22-23; p. 49, ll. 1-14).

63.     In March 2018, plaintiff was aware of the grievance process (Exhibit A, p. 60, ll. 1-3).

64.     Plaintiff was asked if he filed a grievance relative to this incident and he stated that "they would never give me a grievance form" (Exhibit A, p. 59, ll. 9-12).

65.     Plaintiff testified that in the two weeks after this incident but before he was transferred to another facility, "they" would not give him a grievance form to file a grievance for any other issue (Exhibit A, p. 60, ll. 4-13).

66.     Plaintiff admitted to the genuineness of Exhibit A to defendants' Notice to Admit (Exhibit K and Exhibit L, no. 1).

67.     Plaintiff admitted to filing a grievance on March 11, 2018 relating to issues with mail and postage (Exhibit L, no. 2a-c).

68.    Plaintiff admitted that as of March 11, 2018, the grievance process was available,

but claims it was only available for the issue grieved in Exhibit A of defendants' Notice to Admit

(Exhibit K and Exhibit L, no. 2f).

Dated:        Buffalo, New York
              October 8, 2021                **MICHAEL A. SIRAGUSA**
                                             *Erie County Attorney*

                                             By: */s/ Erin Molisani*
                                             Erin E. Molisani, Esq.
                                             Assistant County Attorney
                                             95 Franklin Street, Room 1634
                                             Buffalo, New York 14202
                                             Telephone: (716) 858-2216
                                             Email: erin.molisani@erie.gov

Sworn before me this 8th
day of October, 2021

*s/ Carol Gruber*
Notary Public, State of New York

Reg. 01GR6036976
Qualified in Erie County/Niagara County
My commission expires
February 14, 2022